1  LAW OFFICES OF ROBERT P. SPRETNAK
   Robert P. Spretnak, Esq. (Bar No. 5135)
2  8275 S. Eastern Avenue, Suite 200
   Las Vegas, Nevada 89123
3  Telephone: (702) 454-4900
   Fax: (702) 938-1055
4  Email: bob @ spretnak.com

5  Attorney for Donna Hodges

6

7
                    UNITED STATES DISTRICT COURT
8
                         DISTRICT OF NEVADA
9
   DONNA HODGES,                    )   Case No.:  2:12-cv-01337-JCM-PAL
10                                  )
              Plaintiff,            )
11                                  )
         vs.                        )
12                                  )
   GREENSPUN MEDIA GROUP, LLC,      )
13 a Nevada limited liability company, )
                                    )
14            Defendant.            )
   _____ )

15

16

17        **PLAINTIFF'S RESPONSE TO DOCUMENT 39:**

18     **OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

19

20

21

22

23

24

25

26

27

28

THE  LAW  OFFICES  OF
ROBERT P. SPRETNAK
A  PROFESSIONAL  CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

**TABLE OF CONTENTS**

I.     SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.    MATERIAL AND DISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

III.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

       A.   Defendant Bears the Burden of Showing That There Are
            No Material Facts in Dispute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

       B.   First and Second Claims For Relief:
            Defendant Unlawfully Discriminated Against Mrs. Hodges Because of
            Her Disabilities and Multiple Requests for Reasonable Accommodations . . . .   18

       C.   Third and Fourth Claim For Relief:
            Defendant Unlawfully Harassed Mrs. Hodges and Discriminated
            Against Her Because She Is African-American . . . . . . . . . . . . . . . . . . . . . . . .   24

       D.   Fifth Claim For Relief:
            Defendant Unlawfully Violated Mrs. Hodges Civil Rights
            under 42 U.S.C. § 1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29

       E.   Sixth and Seventh Claims For Relief:
            Defendant Unlawfully Retaliated Against Mrs. Hodges by Terminating
            Her for Objecting to Discriminatory and Disparate Treatment . . . . . . . . . . . . .   31

       F.   Eighth Claim For Relief:
            Defendant Unlawfully Interfered with Mrs. Hodges's Rights
            under the Family and Medical Leave Act . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

       G.   Ninth Claim For Relief:
            Defendant Failed to Pay Mrs. Hodges Earned Overtime Compensation
            During the Time She Was Employed as a Senior Traffic Manager . . . . . . . . .   37

       H.   Tenth Claim For Relief:
            Defendant Is Liable to Mrs. Hodges for Intentional Infliction
            of Emotional Distress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48

       J.   Eleventh Claim For Relief:
            Defendant Wrongfully Interfered with Mrs. Hodges's
            Prospective Employment Opportunities . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48

       K.   Twelfth Claim For Relief:
            Defendant Is Liable for Defamation for Causing the Self-Publication
            of a False and Defamatory Explanation for the Termination
            of Mrs. Hodges's Employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   50

       L.   Defendant Is Not Entitled to a Court Order Limiting Damages
            Based on Particular "After Acquired" Evidence . . . . . . . . . . . . . . . . . . . . . . .   52

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   54

THE  LAW  OFFICES  OF
ROBERT P. SPRETNAK
A  PROFESSIONAL  CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

i

# TABLE OF AUTHORITIES

**CASES**                                                                                    **Page(s)**

*Abshire v. County of Kern*, 908 F.2d 483 (9th Cir. 1990), *cert. denied*,
      498 U.S. 1068, 111 S. Ct. 785, 112 L. Ed. 2d 848 (1991) . . . . . . . . . . . . . . . . . . . . .   42

*Allen v. Iranon*, 283 F.3d 1070 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202
      (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15-16

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 66 S. Ct. 1187, 90 L. Ed. 1515
      (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38

*Apeceche v. White Pine County*, 96 Nev. 723, 615 P.2d 975 (1980) . . . . . . . . . . . . . . . . . . .   18

*Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 4 L. Ed. 2d 393, 80 S. Ct. 453 (1960) . . . .   42

*Bachelder v. America West Airlines*, 259 F.3d 1112 (9th Cir. 2001) . . . . . . . . . . . . . . . . . .   34-36

*Barnett v. U.S. Air, Inc.*, 228 F.3d 1105 (9th Cir. 2000) (en banc),
      *vacated on other grounds, US Airways, Inc. v. Barnett*, 535 U.S. 391,
      122 S. Ct. 1516, 152 L. Ed 2d 589 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

*Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . .   23

*Bell v. Clackamas County*, 341 F.3d 858 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

*Benaugh v. Ohio Civil Rights Comm'n*, 278 Fed. Appx. 501,
      20 Am. Disabilities Cas. (BNA) 1374 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . .   21

*Bergene v. Salt River Project Agric. Improvement & Power Dist.*,
      272 F.3d 1136 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

*Bragdon v. Abbott*, 524 U.S. 624, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998) . . . . . . . . . . . .   19

*Blankenhorn v. City of Orange*, 485 F.3d 463 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . .   16

*Bodett v. CoxCom, Inc.*, 366 F.3d 736 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

*Boker v. Sec. Dept of Treasury*, No. 1:07-cv-446, 2009 U.S. Dist. LEXIS 90109,
      2009 WL 3199074 (S.D. Ohio Sept. 29, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

*Bradley v. City of St. Cloud*, Case No. 6:12-cv-1348-Orl-37TBS,
      2013 U.S. Dist. LEXIS 89862 (M.D. Fla. June 26, 2013) . . . . . . . . . . . . . . . . . . . . . . .   20

*Buckaloo v. Johnson*, 527 P.2d 865 (Cal. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49

*Carrasco v. San Ramon Valley Unified School Dist.*, 258 Fed. Appx. 114 (9th Cir. 2007) . . . .   33

*Chowdhry v. NLVH, Inc.*, 109 Nev. 478, 851 P.2d 459 (1993) . . . . . . . . . . . . . . . . . . . . . . . .   50

*Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115 (9th Cir. 2000) . . . . . . . . . . . . . . .   19, 25, 27-28

THE  LAW  OFFICES  OF
ROBERT P. SPRETNAK
A  PROFESSIONAL  CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

**CASES**                                                                                          **Page(s)**

*Chudacoff v. Univ. Med. Center.*, 437 Fed. Appx. 609 (9th Cir. 2011) . . . . . . . . . . . . . . .   50-51

*Circus Circus Hotels, Inc.  v. Witherspoon*, 99 Nev. 56, 657 P.2d 101 (1983) . . . . . . . . . . . .   50

*Coburn v. PN II, Inc.*, 372 Fed. Appx. 796  (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

*Coghlan v. American Seafoods Co.*, 413 F.3d 1090 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . .

*Cohen v. Fred Meyer, Inc.*, 686 F.2d 793 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

*Core v. Champaign County Bd. of County Commissioners*,
      26 Am. Disabilities Cas. (BNA) 1786, (S.D. Ohio 2012) . . . . . . . . . . . . . . . . . . . . . .   21

*Corning Glass Works v. Brennan*, 417 U.S. 188, 94 S. Ct. 2223, 41 L. Ed. 2d 1 (1974) . . . . . .   42

*Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018 (9th Cir. 2006) . . . . . . . . . . . . . . . 26, 28

*Coszalter v. City of Salem*, 320 F.3d 968 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . .   33

*Davis v. Consolidated Freightways*, 34 Cal. Rptr. 2d 438 (Cal. Ct. App. 1994) . . . . . . . . . . . . 51

*Davis v. Team Elec. Co.*, 520 F.3d 1080 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . .   16, 28

*Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S. Ct. 2148,
      156 L. Ed. 2d 84 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

*Forsberg v. Pacific Northwest Bell Tel. Co.*, 840 F.2d 1409 (9th Cir. 1988) . . . . . . . . . . .   20, 26

*Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640 (6th Cir. 2013) . . . . . . . . . . . . . . . . . . . .   46

*Galen v. County of Los Angeles*, 477 F.3d 652 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . .   15-16

*Harris v. Superior Court of Los Angeles County*, 64 Cal. Rptr. 3d 547 (Cal. Ct. App. 2007) . .   45

*Henry v. Gill Indus., Inc.*, 983 F.2d 943 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

*Hopkins v. Andaya*, 958 F.2d 881 (9th Cir. 1992), *cert. denied*, 513 U.S. 1148,
      115 S. Ct. 1097, 130 L. Ed. 2d 1065 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

*Humphrey v. Memorial Hospitals Ass'n*, 239 F.3d 1128 (9th Cir. 2001) . . . . . . . . . . . . . . . . .   19

*In re Coordinated Pretrial Proceedings*, 906 F.2d 432 (9th Cir. 1990),
      *cert. denied*, 500 U.S. 959, 111 S. Ct. 2274, 114 L. Ed. 2d 725 (1991) . . . . . . . . . . . .   17

*In re Farmers Ins. Exchange*, 466 F.3d 853 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . .   46

*King v. Preferred Technical Group*, 166 F.3d 887, (7th Cir.1999) . . . . . . . . . . . . . . . . . . . . .   35

*Klem v. County of Santa Clara*, 208 F.3d 1085 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . .   42

*K-Mart Corp. v. Washington*, 109 Nev. 1180, 866 P.2d 274 (1993) . . . . . . . . . . . . . . . . . . . .   50

*Leavitt v. Leisure Sports, Inc.*, 103 Nev. 81, 731 P.2d 1221 (1987) . . . . . . . . . . . . . . . . . . . .   49

THE  LAW  OFFICES  OF
ROBERT P. SPRETNAK
A  PROFESSIONAL  CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

**CASES**                                                                              **Page(s)**

*Liu v. Amway Corp.*, 347 F.3d 1125 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348,
    89 L. Ed. 2d 538 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817,
    36 L. Ed. 2d 668 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26-27

*McGinest v. GTE Serv. Corp.*, 360 F.3d 1103 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . 16

*McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 115 S. Ct. 879,
    130 L. Ed. 2d (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52-53

*Noyes v. Kelly Services*, 488 F.3d 1163 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Nuchman v. City of New York*, Case No. 05-cv-4561, U.S. Dist. LEXIS 56256
    (E.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349 (11th Cir. 2000) . . . . . . . . . . . 35

*Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 57 P.3d 82 (2002) . . . . . . . . . . . . . . . . . 50

*Pena v. Bjorndahl*, 177 Fed. Appx. 666 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Perry v. Woodward*, 199 F.3d 1126 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Peterson v. Hewlett-Packard Co.*, 358 F.3d 599 (9th Cir. 2004)  . . . . . . . . . . . . . . . 19, 25-26

*Porter v. California Dep't of Corrections*, 419 F.3d 885 (9th Cir. 2005) . . . . . . . . . . . . . . . 33

*Rexwinkel v. Parsons*, 162 Fed. Appx. 698 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 36

*Rogers v. Missouri P. R. Co.*, 352 U.S. 500, 77 S. Ct. 443, 1 L. Ed. 2d 493 (1957) . . . . . . . . 26

*Schaefer v. Ind. Mich. Power Co.*, 358 F.3d 394 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . 46

*Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . 19

*SEIU, Local 102 v. County of San Diego*, 60 F.3d 1346 (9th Cir. 1994) . . . . . . . . . . . . . . . . 42

*Sischo-Nownejad v. Merced Community Coll. Dist.*, 934 F.2d 1104
    (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080 (9th Cir. 2001) . . . . . . . . . . . . . . . . . 22

*Star v. Rabello*, 97 Nev. 124, 625 P.2d 90 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199 (11th Cir. 2001) . . . . . . . . . . . . . . 35

*Surrell v. California Water Serv. Co.*, 518 F.3d 1097 (9th Cir. 2008) . . . . . . . . . . . . . . . 30, 32

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089,
    67 L. Ed. 2d 207 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 32

THE  LAW  OFFICES  OF
ROBERT P. SPRETNAK
A  PROFESSIONAL  CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

**CASES**                                                                                                          **Page(s)**

*Transp. Workers Union Local 100 v. N.Y. City Transit Auth.*, 505 F.3d 226 (2d Cir. 2007) . . .   20

*Turner v. Hershey Chocolate USA*, 440 F.3d 604 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . .   21

*United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1545 (9th Cir.),
    *cert. denied*, 493 U.S. 809, 110 S. Ct. 51, 107 L. Ed. 2d 20 (1989) . . . . . . . . . . . . . . .   16

*Vance v. Ball State Univ.*, __ U.S. __, 133 S. Ct. 2434, 186 L. Ed. 2d 565 (2013) . . . . . . . . .   44

*Via Alstad v. Office Depot*, 10 I.E.R. Cas. (BNA) 689 (N.D. Cal. 1995) . . . . . . . . . . . . . . . . .   51

*Walters v. City of Atlanta*, 803 F.2d 1135 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . .   30

*Whiting v. Jackson State Univ.*, 616 F.2d 116 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . .   30

*Williams v. Affiliated Foods Southwest, Inc.* Case No. 4-05-cv-00961,
    2007 U.S. Dist. LEXIS 29899 (E.D. Ark. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

*Winsley v. Cook County*, 563 F.3d 598 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

*Yartzoff v. Thomas*, 809 F.3d 1371 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

*Zivkovic v. Southern Cal. Edison Co.*, 302 F.3d 1080 (9th Cir. 2002) . . . . . . . . . . . . . . . . . .   23

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

**STATUTES, RULES AND REGULATIONS**                                      **Page(s)**

29 C.F.R. § 541.100 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   43

29 C.F.R. § 541.102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11, 43-44

29 C.F.R. § 541.200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45-46

29 C.F.R. § 541.201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

29 C.F.R. § 541.300 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47

29 C.F.R. § 825.220(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

29 C.F.R. § 1630.2(o)(2)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

29 C.F.R. §§ 1630.2(o)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

29 U.S.C. §§ 201-219 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1, 38, 42

29 U.S.C. § 206 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38, 40

29 U.S.C. § 207 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38, 40

29 U.S.C. § 213 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38-39, 42-43, 47

29 U.S.C. §§ 2611-2654 . . . . . . . . . . . . . . . . . . . . . . . . .   1, 8-11, 22-24, 34-36, 51

29 U.S.C. § 2611(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

29 U.S.C. § 2611(2)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

29 U.S.C. § 2612(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

29 U.S.C. § 2614(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

29 U.S.C. § 2615 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35-36

42 U.S.C. § 1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   29-31

42 U.S.C. § 1981(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

42 U.S.C. § 1981(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

42 U.S.C. §§ 2000e to 2000e-17 . . . . . . . . . . . . . . . . . . . . . . . .   22, 25, 30-31, 34, 44

42 U.S.C. § 2000e-2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25, 30-32

42 U.S.C. § 2000e-3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

42 U.S.C. §§ 12101-12213 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18-23, 33-34

42 U.S.C. § 12102(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

42 U.S.C. § 12111(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

**STATUTES, RULES AND REGULATIONS**                                    **Page(s)**

42 U.S.C. § 12112(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

42 U.S.C. § 12112(b)(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

42 U.S.C. § 12112(b)(5)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

42 U.S.C. § 12203(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

45 U.S.C. 181 et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   54

Fed. R. Evid. 404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   54

Fed. R. Evid. 801(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

Fed. R. Evid. 802 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

NRS 613.310-613.435 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

NRS 613.330(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18, 25, 32

NRS 613.340(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31-32, 34

**OTHER SOURCES**                                                      **Page(s)**

1A K. O'Malley, J. Grenig, & W Lee, Federal Jury Practice and Instructions,
    Criminal § 12.04 (5th ed. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

# I.

## SUMMARY OF ARGUMENT

Despite numerous health problems, Donna Hodges was able to perform her duties as a Senior Traffic Manager, responsible for coordinating advertising for various publications produced by her employer, Defendant Greenspun Media Group, LLC ("GMG").  Because of these health issues, likely exacerbated by the long working hours, Mrs. Hodges needed minor accommodations to be able to perform the essential functions of her job.  The accommodations were given grudgingly, if at all.

Later, when Mrs. Hodges complained of a racially-inappropriate communication being sent around the office, Mrs. Hodges was deemed to be excessively negative and a problem employee.  Soon thereafter, and right after Mrs. Hodges announced her intention to renew her paperwork for pre-approval to use intermittent medical leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2611-2654, Mrs. Hodges was fired.

Her supervisor Maria Blondeaux complained that Mrs. Hodges – who herself desperately needed to have FMLA leave available to her on an intermittent basis due to her declining physical health – was actively discouraging a co-worker Estee Wright from applying for FMLA leave.  In fact, Mrs. Hodges was merely telling Ms. Wright how to code leave time under GMG's payroll system.

It is wholly reasonable to conclude from the evidence presented that GMG's actions were a mere pretext for unlawful discrimination on the basis of disability and race.  It is also reasonable to conclude that these actions were in retaliation for Mrs. Hodges's repeated objections to discriminatory and disparate maltreatment.  It also is reasonable to conclude that this was an unlawful interference with Mrs. Hodges's right to take FMLA leave on an intermittent basis.

In addition, Mrs. Hodges was working extraordinarily long hours in a position for which she was misclassified as "exempt" from the overtime payment requirements of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219.  Mrs. Hodges's position was not professional, nor was it merely administrative, nor was it executive or managerial, notwithstanding the fact that the word "manager" appeared in the job title.  Mrs. Hodges performed the routine tasks that were at the core of GMG's revenue generation:  the placement of advertising in GMG periodicals.  Mrs. Hodges worked under the tight supervision of Ms. Blondeaux, with all actions other than routine tasks

THE  LAW  OFFICES  OF
ROBERT P. SPRETNAK
A  PROFESSIONAL  CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 1 of 56

1  needing preclearance from Mrs. Hodges's superior.  She worked more than 40 hours per week

2  because her work demands necessitated it.  GMG failed to pay her for the overtime work that she

3  performed.

4       Finally, as a result of the stated reason for Mrs. Hodges's termination,  Mrs. Hodges has

5  found it difficult to procure employment since her termination from GMG.

6       GMG also is not entitled to judgment as a matter of law on its affirmative defense that

7  damages must be cut off based on "after-acquired" evidence.  Defendant's argument that Mrs.

8  Hodges was engaged in selling her excess medication is simply a back door effort to place into the

9  record inadmissible character evidence.  GMG accused Mrs. Hodges of providing a morphine pill

10  to Ms. Wright.  In light of the fact that no action has ever been taken against the recipient of this

11  alleged morphine pill, a jury should be allowed to assess this "after-acquired" evidence.  A jury

12  should be allowed to determine whether GMG would have been acting within its rights to fire the

13  African-American employee with disabilities, and retain the white, able-bodied employee, over this

14  alleged morphine pill.

15       GMG is not entitled to be absolved of liability to Mrs. Hodges as a matter of law.  Mrs.

16  Hodges must be allowed to proceed to trial on her claims of unlawful discrimination and retaliation

17  on the account of disabilities and race, her claim of unlawful interference with her FMLA rights, her

18  claim of entitlement to overtime compensation, and her tort claims that have arisen following the

19  termination of her employment.  For these reasons, Mrs. Hodges asks that the pending motion for

20  summary adjudication be denied in its entirety.

21  **II.**

22  **MATERIAL AND DISPUTED FACTS**

23       Plaintiff Donna Hodges is presenting to this Court admissible evidence that there are genuine

24  issues of material fact precluding entry of summary judgment in favor of Defendant GMG.  GMG

25  has offered a contrary interpretation of the key facts at issue on these claims.

26  **1.    Disparate and racially discriminatory treatment, and the use of racially discriminatory**

27  **language, imagery, and otherwise offensive language in the workplace.**

28       Mrs. Hodges commenced her employment with GMG in 1999.  (Deposition of Donna

THE  LAW  OFFICES  OF
ROBERT P. SPRETNAK
A  PROFESSIONAL  CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 2 of 56

1    Hodges Volume I (March 8, 2013), attached as Exhibit 1, at 29:19)  Throughout her employment

2    with GMG, Mrs. Hodges, who is African-American, voiced complaints about disparate treatment

3    on several occasions.

4         Mrs. Hodges initially complained after GMG demoted her from Traffic Supervisor to Traffic

5    Coordinator in 2005.  (*Id.* at 38:2-5)  When Mrs. Hodges showed concern about the loss of status,

6    John Ottone, GMG human resources representative, told her that he would "look into it."  (*Id.* at

7    41:7-18)  However, the day after Mrs. Hodges's conversation with Mr. Ottone, GMG promoted

8    Janine Hughes, a Caucasian employee, to Traffic Manager despite the fact that Mrs. Hughes had

9    significantly less seniority than Mrs. Hodges and without giving Mrs. Hodges an opportunity to

10   compete for the position. (*Id.* at 41:21-42:3) Mrs. Hodges then went back to Mr. Ottone to complain

11   about Mrs. Hughes's promotion and her inability to compete for it.  (*Id.* at 41:23-42-5) At that point,

12   Mrs. Hodges believed that  she would be better off applying for a departmental transfer.  She then

13   expressed to Mr. Ottone her intention to seek a transfer.  (*Id.* at 42:5-6)  However, GMG ultimately

14   denied her transfer application. (*Id.* at 42:3-43:8) GMG would not promote Mrs. Hodges for another

15   two years.  (*Id.* at 43:9-12)

16        A few years later, in 2010, Mrs. Hodges complained to her manager, Maria Blondeaux, about

17   having been excluded from weekly sales meetings.  (*Id.* at 115:20-23)  As she was the only African-

18   American manager in her department, Mrs. Hodges feared her race was the reason for her exclusion.

19   (*Id.* at 115:23-116:2)  When Mrs. Hodges inquired about the reason behind the decision to exclude

20   her, all that Ms. Blondeaux told her was that Joe Vann, GMG Vice President of Sales, would

21   "appreciate it if [Mrs. Hodges] didn't attend the meetings."  (*Id.* at 119:14-15)

22        Up to that point, Mr. Vann had a history of treating Mrs. Hodges in a disrespectful manner.

23   For example, Mr. Vann never acknowledged Mrs. Hodges's presence, nor did he respond to her

24   verbal greetings, nor did he reply to her work-related email communications.  (*Id.* at 119:22-120:20)

25   Mrs. Hodges considered Mr. Vann's decision to exclude her to be a personal affront motivated by

26   her race and the ultimate showing of disrespect.  (*Id.* at 120:11-16, 122:8)  After Mrs. Hodges's

27   exclusion, Ms. Blondeaux, who is Caucasian, began attending the meetings to obtain the information

28   that Mrs. Hodges needed to carry out her responsibilities.  (*Id.* at 120:17-19, 122:10-13)

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 3 of 56

Toward the end her employment with GMG, Mrs. Hodges also voiced several complaints about racially discriminatory and otherwise offensive language in the workplace. For example, in November 2010, Mrs. Hodges complained to Ms. Blondeaux and a supervisor named Paul Huntsberry about a poster advertising an upcoming potluck. (*Id.* at 75:21-76:7) The poster in question contained a picture of a Sloppy Joe can. (*Id.* at 75:5-7) According to Mrs. Hodges's recollection, the poster had an altered picture of a can of "sloppy joe" style meat, showing the dark-colored ground meat mixture rising out from the can in the color and shape of an "Afro" style hairdo. Eyes were added to the can so that it resembled the face, so that the entire picture looked like a dark-skinned person with an "Afro" style hairdo. To hammer this point home, the word "sloppy" was replaced with the "Nappy." (*Id.* at 75:4-20)

In sum, the poster contained a representation of an African-American person with unkempt (i.e., nappy) hair. (*Id.* at 85:18-21) Mrs. Hodges informed GMG that the word "nappy" is offensive to African-Americans and why the look of the can, in conjunction with the use of this word, made the poster extremely offensive. (*Id.* at 76:9-11, 84:25-85:1) Estee Wright, Mrs. Hodges's co-worker, in her deposition, testified that the word "nappy" was "derogatory," whether the context was "Nappy Joe," as alleged by Mrs. Hodges, or "Nappy Shannon," as alleged by GMG and its witnesses.[1] (Deposition of Estee Wright (May 30, 2013), attached as Exhibit 15, at 29:20)

Mrs. Hodges then said that she would not attend the potluck unless they removed or edited the poster. (Ex. 1 at 76:15-20, 84:7-8) When neither condition occurred, Mrs. Hodges refused to attend the potluck. (*Id.* at 76:22-23) Taking this stance earned Mrs. Hodges a reprimand from Ms. Blondeaux for "not being a team player" and for "overreacting"; she also was directed to get a "thicker skin." (*Id.* at 77:3-4, 84:11, 23-25)

On another occasion, also in 2010, Mrs. Hodges spoke with Ms. Blondeaux about her

---

[1] As set forth in the deposition of Estee Wright:
Q:    Are you familiar with the word nappy?
A:    I am.
Q:    And what, to you, does the word nappy mean?
A:    Well, it can be used as a derogatory word.
(Ex. 15 at 29:17-20)

THE  LAW  OFFICES  OF
ROBERT P. SPRETNAK
A  PROFESSIONAL  CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

concerns vis-à-vis employee Kevin Frace. (*Id.* at 60:8-14) Specifically, Mrs. Hodges said that she found Mr. Frace's joke about a "one-legged flamingo" to be offensive. (*Id.* at 60:16-23) As her coworkers knew, Mrs. Hodges required the use of a cane to walk. (*Id.* at 62:8) In spite of this, Mr. Frace constantly would repeat the joke, "over and over," in Mrs. Hodges's presence. (*Id.* at 60:22) Ms. Blondeaux later forwarded Mrs. Hodges's complaint to Human Resources. (*Id.* at 61:7-22)

Similarly, in January 2011, Mrs. Hodges became aware that Mr. Vann was using the words "pop," "popped," and "popping" in the context of closing a deal. (*Id.* at 64:15-65:2) Mrs. Hodges and a number of female co-workers found the terms to be offensive and became upset as a result. (*Id.* at 64:17-19, 65:15-18, 66:11-20) Based on this, Mrs. Hodges took the lead and complained to Ms. Blondeaux about Mr. Vann's use of these words. (*Id.* at 66:21-24) Ms. Blondeaux ultimately routed Mrs. Hodges's complaint to Human Resources. (*Id.* at 67:3-15)

Mrs. Hodges directed the aforementioned complaints to Ms. Blondeaux because, despite company policy to the contrary, Ms. Blondeaux adamantly required her subordinates to bring all complaints to her, instead of Human Resources. (*Id.* at 62:20-21, 66:23-24, 84:21-23) Ms. Blondeaux controlled the flow of communications. Mrs. Blondeaux reserved for herself the right to decide whether to notify Human Resources. (*Id.* at 84:22-23) Due to this policy, Ms. Blondeaux appears to have become annoyed with Mrs. Hodges. Ms. Blondeaux considered Mrs. Hodges to be a "very negative" person whose complaints she "wouldn't say [were] reasonable." (Deposition of Maria Blondeaux (May 30, 2013), attached as Exhibit 3, at 103:6-104:19) Days after Mrs. Hodges's last complaint (i.e., Mr. Vann's use of the word "pop"), GMG put Mrs. Hodges under the microscope and began investigating her for termination. (*Id.* at 35:9-36:3)

Despite Defendant's claims to the contrary, Ms. Blondeaux appears to have been actively involved in the investigatory process from its very inception. As she has admitted, Ms. Blondeaux "was a part of the interviews and the research that [GMG] did" before deciding to terminate Mrs. Hodges. (*Id.* at 15:7-8) For example, Ms. Blondeaux interviewed several GMG employees as part of this process, including Mrs. Hodges, Estee Wright, Kim Smith, Kristin Komorny, and Kim Chang. (*Id.* at 39:25-40:10) In addition, Ms. Blondeaux would "recap" with Tanya Vial, a Human Resources representative at GMG, after these interviews to "mak[e] sure that [they] were both on the same

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

page.". (*Id.* at 48:20-25)  Moreover, Ms. Blondeaux would review memoranda which Ms. Vial had prepared regarding the interviews. (*Id.* at 49:9-51:3) As part of this review process, Ms. Vial would ask Ms. Blondeaux for her opinion regarding the contents of the memoranda. (*Id.* at 51:4-11)  In the end, as Ms. Blondeaux put it, the decision to terminate Mrs. Hodges was made based on the facts uncovered during these interviews and reflected on these memoranda, as well as on Ms. Blondeaux's past "interactions" and "conversations" with Mrs. Hodges. (*Id.* at 44:16-23)

GMG replaced Mrs. Hodges with an able-bodied Caucasian employee Estee Wright. (*Id.* at 32:17-19) Ms. Wright, who was Mrs. Hodges's subordinate at the time, assumed all of Mrs. Hodges job duties – not merely "some" as stated in her deposition. (Ex. 15 at 16:16-19)

More specifically, as a Senior Traffic Manager, Mrs. Hodges was responsible for (1) coordinating the scheduling, processing, and trafficking of advertisement; (2) managing breaks and time off; (3) approving timecards; (4) establishing and maintaining strong working relationships with key members and all departments; (5) providing training for new hires on the Sales team; (6) working with account coordinators to ensure information flowed to Traffic following established procedures; (7) ensuring that pagination for the various publications was completed, distributed to Production, and edited on time; and (8) setting up and maintaining rate cards. (*Id.* at 30:3-43:2) When asked about these duties in her deposition, Ms. Wright admitted that she had assumed, at some point or another, every single one of them since Mrs. Hodges's termination. (*Id.* at 30:3-43:2)

**2.      Requests for accommodation resulting from documented disabilities.**

GMG stated in deposition that its decision to fire Mrs. Hodges was made based on the facts uncovered during an investigation, as well as on Ms. Blondeaux's past "interactions" and "conversations" with Mrs. Hodges. (Ex. 3 at 44:16-23)  Among Ms. Blondeaux's past "interactions" and "conversations" with Mrs. Hodges are the several requests for accommodation which Mrs. Hodges directed to Ms. Blondeaux while employed at GMG.  These requests were a consequence of Mrs. Hodges's severe asthma, lumbar radiculopathy, and sarcoidosis, among other serious conditions about which GMG had knowledge.  (Deposition of Donna Hodges Volume II, attached as Exhibit 2, at 313:25-314:3)

Mrs. Hodges's asthma was exacerbated in 2009.  The constant buildup of dust, dirt and,

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 6 of 56

1    possibly, mold behind her cubicle prompted Mrs. Hodges to request an accommodation.  (*Id.* at

2    412:19-413:18, 414:1)  Mrs. Hodges spoke with Ms. Blondeaux and Megan Wells, the property

3    manager, about the possibility of cleaning the area behind her cubicle because the dust therein was

4    seriously compromising her breathing.  (*Id.* at 412:22-24)

5         Mrs. Wells initially told Mrs. Hodges that the cleaning crew was not required to clean that

6    area.  (*Id.* at 412:23-24)  After Mrs. Hodges's breathing became more difficult and her physicians

7    had begun to treat her for this condition, Mrs. Wells allowed Mrs. Hodges to use a fan, albeit at her

8    own expense, to reduce the problem and aid her breathing.  (*Id.* at 414:10-415:7)  A simple cleaning

9    directive may well have been the more appropriate accommodation, but it was not implemented.

10        On another occasion, Mrs. Hodges's doctor suggested that the use of an ergonomic chair

11   would help with her radiculopathy.  (*Id.* at 362:10-16)  Because of this, Mrs. Hodges asked Ms.

12   Blondeaux for an ergonomic chair with a lumbar "pump" mechanism.  (*Id.* at 362:17-364:15;  Ex.

13   3 at 57:16-58:8)  Eventually, and grudgingly, GMG provided Mrs. Hodges with the chair she needed

14   as a result of her covered disability.  (Ex. 2 at 364:20-22)

15        In early January 2011, mere weeks before her termination, Mrs. Hodges's worsening

16   sarcoidosis prompted her to request a reduced work schedule as an accommodation.  (*Id.* at 335:16-

17   24)  While treating her for constant flare-ups, Mrs. Hodges's physician recommended that she reduce

18   her working hours.  Mrs. Hodges then spoke with Ms. Blondeaux about the possibility of reducing

19   her workload.  (*Id.* at 335:16-24, 339:3-4)  While Ms. Blondeaux expressed to Mrs. Hodges that

20   giving her a reduced work schedule would not be a problem, this statement did not match with the

21   reality of Mrs. Hodges's workplace, as Mrs. Hodges  had to renew her request with Ms. Blondeaux

22   later that month, just days before her termination.  (*Id.* at 339:6-11)  In the end, GMG never

23   accommodated Mrs. Hodges's request for a reduced work schedule and, instead, terminated her

24   employment a few short days later.

25        Furthermore, contrary to Ms. Blondeaux's assertion that she was not aware of any mobility

26   issues that affected Mrs. Hodges's ability to perform her assigned job duties, Ms. Blondeaux was

27   fully aware of – and routinely disregarded – Mrs. Hodges's readily apparent physical handicaps. (Ex.

28   3 at 79:5-7, 407:21-412:4)  In fact, Ms. Blondeaux knew that Mrs. Hodges's handicaps prevented

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 7 of 56

Mrs. Hodges from attending many required work-related activities.  This may well have contributed to Ms. Blondeaux's negative view that Mrs. Hodges was not a "team player." (Ex. 2 at 407:21-409:8)  For example, in separate occasions Ms. Blondeaux insisted that Mrs. Hodges participated in a Creole walk-through tour and in a tour of Southern Wine and Spirits. (*Id.* at 407:21-22, 411:18-412:1) These tours required extensive walking and, to Mrs. Hodges's knowledge, the tour operators did not provide carts or wheelchairs that would have aided Mrs. Hodges or any other potential mobility-impaired tour participant. (*Id.* at 407:22-408:2, 411:16-412:4) Ms. Blondeaux disregarded Mrs. Hodges's physical inability to attend the tours based on these readily apparent mobility issues. Ms. Blondeaux called Mrs. Hodges's attitude "unacceptable," and verbally reprimanded her for failing to attend functions that Mrs. Hodges was physically unable to attend due to her covered disabilities. (*Id.* at 408:18-411:17)

Finally, some of Mrs. Hodges's other requests for accommodation included asking for a larger computer monitor, an electric stapler, and a left-handed mouse. (Ex. 3 at 57:6-15)  Mrs. Hodges eventually received a larger monitor and an electric stapler. (*Id.* at 58:23-60:12; Ex. 2 at 390:14-17)  However, the stapler quickly broke and Ms. Blondeaux denied Mrs. Hodges's request for a replacement stapler. (Ex. 3 at 58:23-60:12; Ex. 2 at 391:12-25; 378:3-13) Ms. Blondeaux also denied Mrs. Hodges's simple request for a special computer mouse. (*Id.*)  Ms. Blondeaux said to Mrs. Hodges that she "[couldn't] keep asking for all these things" and that "if there was one more request, they," referring to Human Resources, "were going to hit the roof." (Ex. 2 at 391:23-24, 378:11-13)

### 3.   Pending application to renew benefits under the FMLA

Because of Mrs. Hodges's medical conditions – the asthma, the lumbar radiculopathy, and her sarcoidosis – Mrs. Hodges was entitled to seek and receive certification for benefits under the FMLA. (Ex. 2 at 303:25-304:3) In fact, Mrs. Hodges was certified twice while employed at GMG. (*Id.* at 304:4-6)

While GMG did not previously oppose Mrs. Hodges's certification, GMG systematically and definitively blocked Mrs. Hodges's efforts in late 2010 and early 2011.  First, Ms. Vial – the GMG human resources representative who partnered with Ms. Blondeaux in GMG's investigations into

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A  PROFESSIONAL  CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Mrs. Hodges – did not provide Mrs. Hodges with the required paperwork for recertification until Mrs. Hodges had asked for it at least three times in one-month time period starting in December 2010.  (*Id.* at 395:1-8, 396:3-8)  Second, when Ms. Vial finally made these forms available to Mrs. Hodges in January 2011, she actively tried to discourage Mrs. Hodges from filing for FMLA.  This is the very same act that GMG would accuse Mrs. Hodges of doing with her co-worker Estee Wright.

Ms. Vial told Mrs. Hodges that "[she] shouldn't file" because "intermittent FMLA is more primarily used when someone has to have dialysis three days a week or they're diabetic."  (*Id.* at 307:4-5, 396:10-17)  Mrs. Hodges was upset to hear Ms. Vial imply that her conditions were not serious.  Nevertheless, Mrs. Hodges restated her position that "[her] situation [was] going to require significant intermittent FMLA," and she re-affirmed her unshakable determination to apply for the benefits to which she was lawfully entitled.  (*Id.* at 396:16-20)  Days later, Mrs. Hodges was no longer employed at GMG.

In its Motion for Summary Judgment, GMG has denied that it terminated Mrs. Hodges in retaliation for her many complaints, accommodation requests, and FMLA applications and usage. (*See* Defendant's Motion for Summary Judgment ("Motion") at 1, ll.14-21)  Instead, GMG contends that it decided to fire Mrs. Hodges in response to a purported first-time violation of company policy. (*See id.*, at 1, ll.3-4)  GMG has accused Mrs. Hodges of trying to discourage one of her co-workers, Estee Wright, from filing for FMLA by insinuating that GMG would retaliate against Ms. Wright if she did so. (*See id.*, at 5, ll.25-27)  GMG also argues that Mrs. Hodges instructed Ms. Wright not to use FMLA for an upcoming medical procedure and, in its place, use PTO, "paid time off." (*See id.*, at 5, ll.23-24)

This is inconsistent with the evidence put forth by Mrs. Hodges.  Mrs. Hodges received FMLA benefits in the past.  She was in the process of becoming recertified to be eligible to use medical leave under the FMLA on an intermittent basis.  (Ex. 2 at 304:4-6, 396:16-20; Ex. 3 at 73:20-23)  Up to that point, Mrs. Hodges had not yet been subjected to negative consequences for applying for intermittent FMLA leave.  Since GMG had not interfered with Mrs. Hodges's FMLA certification up to that point, Mrs. Hodges would have had no reason to believe GMG would retaliate against Ms. Wright if Ms. Wright too were to file for FMLA. (Ex. 2 at 304:4-6)  In light of this, Mrs.

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 9 of 56

Hodges "never dissuaded [Ms. Wright] from filing [for] FMLA." (*Id.* at 333:5)  More specifically, Mrs. Hodges never stated that she was going to terminate Ms. Wright or interfere with Ms. Wright's chances for promotion because of FMLA. (Ex. 3 at 73:10-17, 43:18-44:8)

Contrary to GMG's argument that Mrs. Hodges tried to discourage Ms. Wright from filing for FMLA leave, Mrs. Hodges never discussed with Ms. Wright whether Ms. Wright should use FMLA or Ms. Wright's eligibility for FMLA. (Ex. 2 at 331:9-335:25)  Instead, when Ms. Wright spoke with Mrs. Hodges about an upcoming medical procedure on January 24, 2011, Mrs. Hodges arranged for Ms. Wright to take time off work.  (*Id.* at 331:14-332:3)  At no point in that conversation did Ms. Wright ask Mrs. Hodges for FMLA leave.  (*Id.* at 332:4-8)  The only time FMLA came up was at the end of the conversation, when Ms. Wright expressed to Mrs. Hodges her intention to apply for FMLA.  (*Id.* at 332:4-8)  Having received training in FMLA procedures and having obtained a high passing score in the FMLA quiz, Mrs. Hodges was aware that employers must not prevent qualified employees from taking FMLA leave, and that all eligibility-related questions were to be forwarded to Human Resources.  (*Id.* at 318:11-326:15)  In light of this, once Ms. Wright informed Mrs. Hodges that she was going to file for FMLA, Mrs. Hodges saw "no reason" to discuss FMLA.  (*Id.* at 332:4-333:1)  Similarly, Mrs. Hodges refrained from discussing FMLA with Ms. Wright two days later, on January 26, 2011, when Ms. Wright told her she had already filed for FMLA.  (*Id.* at 339:19-341:18, 334:7-8)

As for GMG's contention that Mrs. Hodges directed Ms. Wright to use PTO instead of FMLA while Ms. Wright convalesced from surgery, Mrs. Hodges never intended to interfere with Ms. Wright's FMLA rights.  (*Id.* at 332:12-14)  And, it must be noted, GMG never accused Mrs. Hodges from trying to prevent Ms. Wright from taking leave.  GMG has said only that Mrs. Hodges actively discouraged Ms. Wright from recording her leave as "FMLA."  GMG said that Mrs. Hodges told Ms. Wright to enter her time, instead, as "PTO."  GMG effectively concedes that Mrs. Hodges never tried to prevent Ms. Wright from missing work and that she never tried to prevent Ms. Wright to be paid during her absence.  The issue was only how this leave should be coded in the payroll system.

Under "ABRA" – GMG's payroll system in effect at that time – there was no separate code

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

1  for FMLA or even vacation time.  Only PTO was available. (Ex. 3 at 116:4-17)  In other words,

2  employees could not directly enter FMLA leave or vacation into ABRA for their own time off.  (*Id.*

3  at 34:8-20)  Instead, ABRA required employees to enter PTO into the software and then request

4  Human Resources to convert their PTO into FMLA leave. (*Id.* at 119:18-19, 34:8-20)  There is a

5  logical reason for this.  An employee would be prevented from entering "FMLA" into the system if

6  it had not been approved and, presumably, in excess of the amount that the employee was authorized

7  to take, whether by statute or by the employee's physician.

8       From the employee's standpoint, FMLA was a form of PTO.  (*Id.* at 34:21-35:8)  In the case

9  of Ms. Wright, the only PTO-related discussion occurred when Mrs. Hodges spoke with Ms. Wright

10  about how to enter three or five days of authorized absences into ABRA.  (Ex. 2 at 333:13-25)

11  Contrary to what Ms. Blondeaux now contends, Mrs. Hodges never told Ms. Wright to use PTO and

12  not justify her time off.[2]  (Ex. 3 at 113:2-5)  Rather, Mrs. Hodges told Ms. Wright to enter her

13  absences into ABRA as PTO not to interfere with Ms. Wright's FMLA rights, or to prevent Ms.

14  Wright from using FMLA – as GMG accuses Mrs. Hodges of doing – but because this was Mrs.

15  Hodges's understanding that this was how ABRA required employees to go about coding their

16  medical leave time in the company's payroll system.  (*Id.* at 34:8-35:10; Ex. 2 at 332:12-14)

17  **4.      Entitlement to overtime pay under the Fair Labor Standards Act**

18       Mrs. Hodges did not supervise or manage the work of any employee at GMG as those terms

19  are defined at 29 C.F.R. § 541.102.[3]  (Objections and Responses to Defendants' First Set of

20

21       [2]  Ms. Blondeaux's testimony about what Mrs. Hodges told Ms. Wright is inadmissible
22  hearsay under Fed. R. Evid. 802.  While GMG witnesses may testify as to what Mrs. Hodges said,
     as these would be admissible as statements by a party-opponent as defined by Fed. R. Evid.
23  801(d)(2).  However, as Ms. Blondeaux would not have been a participant in a private conversation
     between Mrs. Hodges and Ms. Wright, her purported knowledge of such a conversation would have
24  had to come from another source.

25       [3]  According to 29 C.F.R. § 541.102:
26            Generally, "management" includes, but is not limited to, activities
              such as interviewing, selecting, and training of employees; setting and
27            adjusting their rates of pay and hours of work; directing the work of
              employees; maintaining production or sales records for use in

28                                                                    (continued...)

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

1   Interrogatories to Plaintiff, attached as Exhibit 18, at 13, ll.4-17)

2       Mrs. Hodges was employed as a Senior Traffic Manager at the time of her termination.  (Ex.

3   1 at 202:13-16)  In this capacity, Mrs. Hodges did not have the ability to hire and fire GMG

4   employees.  With regard to hiring, Mrs. Hodges was only allowed to be present while Ms. Blondeaux

5   interviewed candidates.  (*Id.* at 201:1-2)  After the interviews, Ms. Blondeaux would give Mrs.

6   Hodges a chance to make a recommendation.  (*Id.* at 201:2-3)  However, Ms. Blondeaux retained

7   the right to make the final hiring selection based on who she thought would be a good fit for the

8   department.  (*Id.* at 201:4-8)

9       Similarly, with respect to firing, Mrs. Hodges was not allowed to unilaterally terminate the

10  employment of those employees who supposedly were under her supervision.  (Ex. 3 at 72:22-73:9)

11  If Mrs. Hodges wanted to fire someone, Ms. Blondeaux would be in a position to intervene, take

12  control, and prevent her from doing so.  (*Id.* at 73:5-9)  Mrs. Hodges's inability to hire and fire is

13  consistent with Ms. Wright's inability to do the same.  (Ex. 15 at 46:1-15)  Ms. Wright, who became

14  Mrs. Hodges's replacement, is not allowed to unilaterally hire and fire employees.  (*Id.* at 46:1-15)

15  Ms. Blondeaux continues even until today to initiate the process to hire staff, lead interviews with

16  prospective employees, and have the final approval on hires.  (*Id.* at 46:1-15)

17      As a Senior Traffic Manager, Mrs. Hodges was not in the position to set, or even influence

18  the setting of, policies and procedures at GMG or the Traffic Department. Instead, Mrs. Hodges was

19  merely tasked with the responsibility to oversee the work of several employees in the Traffic

20

21  _____

22  [3](...continued)
        supervision or control; appraising employees' productivity and

23      efficiency for the purpose of recommending promotions or other
        changes in status; handling employee complaints and grievances;

24      disciplining employees; planning the work; determining the
        techniques to be used; apportioning the work among the employees;

25      determining the type of materials, supplies, machinery, equipment or
        tools to be used or merchandise to be bought, stocked and sold;

26      controlling the flow and distribution of materials or merchandise and
        supplies; providing for the safety and security of the employees or the

27      property; planning and controlling the budget; and monitoring or
        implementing legal compliance measures.

28

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 12 of 56

Department.  (Ex. 1 at 136:15-24)  As part of these duties, Mrs. Hodges was actively involved in training these employees, counseling them, intervening if they had a conflict among themselves, and drafting performance evaluations for Ms. Blondeaux's approval.  (*Id.* at 186:4-14, 188:23-189:1, 197:1, 138:17-19)

Mrs. Hodges did not have complete authority to conduct any of these activities independently, or without the close supervision of Ms. Blondeaux.  For example, with regard to training, Mrs. Hodges was not the only person responsible for training employees in the Traffic Department.  (*Id.* at 186:15-25)  In fact, all Traffic Coordinators "were responsible for training someone else if someone new came into the department."  (*Id.* at 186:21-4)  Also, with respect to counseling, Mrs. Hodges was only permitted to engage the employee to gather the information needed to brief Ms. Blondeaux, who was in a position to call the employee to her office for formal counseling.  (*Id.* at 189:12-19)  In other words, Mrs. Hodges was not allowed to write-up employees for substandard performance.  (*Id.* at 189:2-7)  Instead, Mrs. Hodges had to put in writing what the problem was about before taking it to Ms. Blondeaux, who would then "decide whether to let it go or call it a write-up."  (*Id.* at 188:16-19; 189:20-22)

Similarly, as for conflict resolution, Mrs. Hodges was only allowed to handle workflow-related conflicts on her own.  (*Id.* at 197:1)  However, even for that type of conflict, Ms. Blondeaux would often have to weigh in.  (*Id.* at 146:7-148:4)  For all other types of conflict, including basic complaints from employees who allegedly were under her supervision, Mrs. Hodges was required to forward the issue to Ms. Blondeaux for resolution.  (*Id.* at 196:9-18)  Finally, regarding evaluations, Mrs. Hodges was allowed to send out self-evaluation forms, which she and Ms. Blondeaux would review after they had completed the forms. (*Id.* at 138:22-139:5)  At that stage, Mrs. Hodges would provide her own assessment of the employees' performance, but her assessments were not final.  (*Id.* at 148:5-149:20)  Instead, Ms. Blondeaux would often review the assessment and change that with which she did not agree.  (*Id.* at 148:5-149:20)  In the end, it was Ms. Blondeaux, and not Mrs. Hodges, who had the final say when it came to the evaluation of employees.  (*Id.* at 148:5-149:20)

In compensation for her job, GMG paid Mrs. Hodges on a salary basis regardless of the hours

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 13 of 56

actually worked.  (Ex. 2 at 281:3-13)  While Mrs. Hodges did not expressly demand to be paid overtime, she spoke with Ms. Blondeaux about the fact that she was working "too many hours." (*Id.* at 282:2-8)  In fact, Ms. Blondeaux conceded that Mrs. Hodges worked until "late at night" and spent "too many hours at the office," "even on weekends." (Ex. 3 at 62:6-8, 63:14-15)  Similarly, Ms. Wright realized that Mrs. Hodges was already at the office when she arrived at 8:00 a.m., and would typically still be there when she left for the day at 5:00 p.m. (Ex. 15 at 12:13-20)  On average, Mrs. Hodges would work approximately between 12 and 14 hours per day during the week and between five and six hours on weekends.[4]  (Ex. 2 at 457:14-17, 459:5-13)

**5.    Interference with economic advantage and self-defamation**

When GMG decided to fire Mrs. Hodges, the reason it gave for its decision to do so was Mrs. Hodges's alleged "substandard" performance as a manager, even though Mrs. Hodges never received disciplinary action prior to her termination.  (Ex. 2 at 427:19-20; Ex. 3 at 106:15-17)  Mrs. Hodges has been engaged in an extensive job search since her termination.  In doing so, Mrs. Hodges has had to disclose that she left GMG in unfavorable terms or, more specifically, that the reason GMG gave for terminating her was that she was a "substandard manager." (*Id.* at 427:19-24, 430:21-23)  This, predictably, has been costly to her job prospects.

Among the businesses to which Mrs. Hodges sent employment applications are AppleOne, Stratosphere, Ameristar, Robert Woods, R&R Advertising, and The Merica Agency. (*Id.* at 428:8-441:16)  Some of these potential employers have directly contacted GMG, while others are in the publishing business, just as is GMG. (*Id.* at 428:23-24, 437:24-4382)  Those who contacted GMG have later refused to interview Mrs. Hodges.  (*Id.* at 428:23-24)  At least one prospective employer even expressed to Mrs. Hodges that "[it] could not hire [Mrs. Hodges] because [it was] going to be doing business [with GMG] and [Mrs. Hodges] didn't leave on favorable terms." (*Id.* at 428:23-

---

[4]  In Mrs. Hodges's calculation of damages set forth in her Initial Disclosures, as incorporated by reference in her responses to interrogatory questions set forth in Exhibit 18, Mrs. Hodges estimated the total amount of uncompensated overtime hours worked at GMG to be 764 for the covered period of 2009 and 2,621.5 for 2010.  The actual amount of uncompensated hours above 40 per work week is not at issue in the adjudication of the pending motion for summary judgment and, therefore, these numbers are set forth merely for background purposes.

THE  LAW  OFFICES  OF
ROBERT P. SPRETNAK
A  PROFESSIONAL  CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 14 of 56

430:20)  Another potential employer has even said that it could not offer Mrs. Hodges a job after finding out from GMG that Mrs. Hodges was in "non-rehirable status." (*Id.* at 431:16-432:20)

It has been ever worse when Mrs. Hodges has contacted potential employers that are in the publishing business.  Such businesses have refused to even interview Mrs. Hodges because they cannot be sure there will not be a conflict between Mrs. Hodges and GMG. (*Id.* at 437:14-438:2, 439:23-440:5-8)  Thus, the false and improper grounds for Mrs. Hodges's termination that has been stated by GMG has prevented Mrs. Hodges from obtaining alternative employment in her field of expertise and experience.

### III.

### ARGUMENT

### A.

**Defendant Bears the Burden of Showing That There Are No Material Facts in Dispute**

Defendant GMG bears the burden of proof to show that there are no material issues of fact to be resolved at trial and that it is entitled to judgment as a matter of law.  Defendant has wholly failed to carry its burden.  Plaintiff Donna Hodges has presented evidence to this Court upon which a reasonable factfinder could hold Defendant liable for various unlawful discrimination under federal and Nevada law.

As the moving party, Defendant bears the burden of establishing that there are no genuine issues of material fact remaining for trial.  "The party moving for summary judgment has the burden of proving the absence of any genuine issue of material fact that would allow a judgment as a matter of law."  *Hopkins v. Andaya*, 958 F.2d 881, 884 (9th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)), *cert. denied*, 513 U.S. 1148, 115 S. Ct. 1097, 130 L. Ed. 2d 1065 (1995).  Defendant failed to carry its burden.

Summary judgment is appropriate where, "drawing all reasonable inferences supported by the evidence in favor of the non-moving party," the court finds "that no genuine disputes of material fact exist." *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 742 (9th Cir. 2004).  The non-moving party need only make "a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial."  *Galen v. County of Los*

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 15 of 56

1  *Angeles*, 477 F.3d 652, 658 (9th Cir. 2007).  "In evaluating motions for summary judgment in the

2  context of employment discrimination, we have emphasized the importance of zealously guarding

3  an employee's right to a full trial, since discrimination claims are frequently difficult to prove

4  without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses."

5  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004).

6      A court evaluating a summary judgment motion must consider all "justifiable" and

7  "legitimate" inferences in the nonmoving party's favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio*

8  *Corp.*, 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  "Inferences may be

9  drawn from underlying facts not in dispute such as background or contextual facts as well as from

10  disputed underlying facts which the judge must assume will be resolved at trial in favor of the

11  nonmovant."  *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1545 (9th

12  Cir.), *cert. denied*, 493 U.S. 809, 110 S. Ct. 51, 107 L. Ed. 2d 20 (1989).  "[I]t is axiomatic that

13  disputes about credibility determinations must be resolved at trial, not on summary judgment."

14  *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1096 (9th Cir. 2008).



*Young woman or old lady?*

This Court "may not affirm a grant of summary judgment if there is any genuine issue of material fact [b]ecause 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,' when reviewing a grant of summary judgment, 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'"  *Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007) (quoting *Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513).

Courts should be exceedingly reluctant to

28

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

1   dispose of cases under Fed. R. Civ. P. 56.  Evidence often is ambiguous and nuanced.  Different

2   people looking at the same thing may see different things.  For example, in the famous optical

3   illusion of the Young Woman/Old Lady, the drawing is susceptible to two very different

4   interpretations.  Some may see the younger lady, looking away, while others may see the elderly

5   woman, in profile.

6          Evidence in litigation can seem like an optical illusion.  Where some may see the jaw line

7   of the young woman, others see the nose of the elderly lady.  What looks to some like the eye of one,

8   appears as an ear to others.  The nape of a neck?  Or the outline of a closely-drawn kerchief?  The

9   jury gets to decide the picture they see.  When a picture is ambiguous and capable of different

10   interpretations, this Court must not examine and weigh the evidence to decide what is being seen.

11   In essence, this Court may not declare that this to be a picture of an elderly woman.  Or a young lady.

12   Disputed evidence must go to the jury.

13          Defendant bears the burden of proving that the evidence is wholly unambiguous.  Plaintiff

14   does not have to prove that she has the stronger case, or the more logical interpretation of the

15   disputed facts.  Defendant must show that a reasonable factfinder would be wholly incapable of

16   reaching a different conclusion when sorting through the disputed issues of fact that have been

17   presented.  To again use the example of this simple pencil drawing, Defendant must prove the

18   equivalent of demonstrating that this is unambiguously a profile of an elderly woman, kerchief over

19   her hair, and that in no way could a juror ever see the young lady looking away.

20          The Court must not weigh the evidence and decide which view, which inference is the more

21   plausible one.  So long as a particular inference is plausible and permissible, it is for the jury to

22   decide whether to draw it.  *In re Coordinated Pretrial Proceedings*, 906 F.2d 432, 462-463 (9th Cir.

23   1990), *cert. denied*, 500 U.S. 959, 111 S. Ct. 2274, 114 L. Ed. 2d 725 (1991).  The presumption

24   against summary adjudication is so strong that the opposing party need not offer any evidence or

25   affidavits in order to prevail.  "The party opposing the motion is under no obligation to offer

26   affidavits or any other materials in support of its opposition.  Summary judgment may be resisted

27   and must be denied on no other grounds than that the movant has failed to meet its burden of

28   demonstrating the absence of triable issues."  *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir.

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 17 of 56

1    1993).

2         This is a difficult burden to bear and Defendant failed to carry its burden.  Too much of the

3    evidence is in dispute on each of Mrs. Hodges's claims.  This case should proceed to jury trial.

4

5                                              **B.**

6                          **First and Second Claims For Relief:**

7    **Defendant Unlawfully Discriminated Against Mrs. Hodges**
     **Because of Her Disabilities and Multiple Requests for Reasonable Accommodations**

8         Donna Hodges has presented evidence to this Court that she has suffered unlawful

9    discrimination on the basis of disability in violation of both federal and Nevada law.  Defendant

10   GMG asks this Court to render a different interpretation of the evidence.  These genuine issues of

11   material fact preclude summary adjudication of Mrs. Hodges's two disability-related claims.

12        Donna Hodges suffered a pattern of discrimination due to her disabilities.  She requested

13   accommodations for her various disabilities and was told that she already requested too much.  When

14   accommodations were provided, they were provided grudgingly.  The evidence before this Court is

15   sufficient to establish that Mrs. Hodges's disabilities, and the medication that she took to allow her

16   to function, led directly to her termination as Senior Traffic Manager.

17        The first two claims for relief that were pled by Mrs. Hodges both allege unlawful

18   discrimination due to disability.  Mrs. Hodges's first claim alleges unlawful discrimination in

19   violation of the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. §§ 12101-12213.

20   Her second claim alleges unlawful disability-related discrimination and disparate treatment in

21   violation of NRS 613.330(1).[5]

22        The Ninth Circuit has clearly stated that claims for unlawful discrimination in employment,

23   such this case, are particularly ill-suited to summary disposition.  "As a general matter, the plaintiff

24

25        [5] According to the Nevada Supreme Court, claims for unlawful discrimination under NRS

26   613.330(1) are assessed as they are under the applicable federal anti-discrimination law.  *See*
     *Apeceche v. White Pine Co.*, 96 Nev. 723, 726-27, 615 P.2d 975, 977-78 (1980);  *see also Coburn*

27   *v. PN II, Inc.*, 372 Fed. Appx. 796, 797 n.1 (9th Cir. 2010).  Thus, for the same reasons that she is
     entitled to prevail on these discrimination claims under federal law, so too may she recover damages

28   under the Nevada law barring unlawful discrimination that is set forth at NRS 613.330(1).

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123                          Page 18 of 56

in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment. This is because 'the ultimate question is one that can only be resolved through a searching inquiry – one that is most appropriately conducted by a factfinder, upon a full record.'" *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996)).

It is unlawful for an employer to "discriminate against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). According to the ADA, "discriminate" includes "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." 42 U.S.C. § 12112(b)(5)(B). The term "reasonable accommodation" is defined as follows:

> The term "reasonable accommodation" may include –
> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
> (B) **job restructuring**, part-time or modified work schedules, reassignment to a vacant position, **acquisition or modification of equipment or devices**, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9) (emphasis added); *see also Bragdon v. Abbott*, 524 U.S. 624, 633, 118 S. Ct. 2196, 2202, 141 L. Ed. 2d 540 (1998).

In order to establish a prima facie case of disability discrimination under the ADA, a plaintiff must demonstrate that: (1) she is **disabled** as defined under the ADA; (2) she is **qualified**, with or without a reasonable accommodation, **to perform the essential functions of the job**; and (3) she **suffered an adverse employment action** because of her disability or that the employer failed to make a reasonable accommodation. *Humphrey v. Memorial Hospitals Ass'n*, 239 F.3d 1128, 1133 (9th Cir. 2001); *see also Winsley v. Cook County*, 563 F.3d 598, 603 (7th Cir. 2009). "The amount of evidence" that the plaintiff "must produce is 'very little,'" *id.* (quoting *Chuang*, 225 F.3d at 1124), "so long as it is more than "'purely conclusory allegations of alleged discrimination, with no concrete relevant particulars.'" *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004) (quoting

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 19 of 56

*Forsberg v. Pacific Northwest Bell Tel. Co.*, 840 F.2d 1409, 1419 (9th Cir. 1988)).

Mrs. Hodges has presented admissible evidence to this Court that she is disabled as defined under the ADA, that she was qualified for his position, that she suffered an adverse employment action related to her disabilities, and also that she was not provided with all reasonable accommodations requested.

First, Mrs. Hodges was and is "disabled" as defined under the ADA. The term "disability" under the ADA refers to both an **actual disability** and to the **perception of having a disability**:

> The term "disability" means, with respect to an individual –
> (A) a physical or mental impairment that substantially limits one
>       or more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

Mrs. Hodges has identified three medical conditions constituting covered disabilities under the ADA: severe asthma, lumbar radiculopathy, and sarcoidosis. (*See* Document Nos. GMG000312-GMG000314, attached as Exhibit 4) Each individually, and when considered in total, constitute a covered disability under the ADA.

First, asthma is a recognized disability under the ADA. *See, e.g., Bradley v. City of St. Cloud*, Case No. 6:12-cv-1348-Orl-37TBS, 2013 U.S. Dist. LEXIS 89862 (M.D. Fla. June 26, 2013) (motion to dismiss denied on ADA claim based on disability of asthma); *see also Transp. Workers Union Local 100 v. N.Y. City Transit Auth.*, 505 F.3d 226, 228 (2d Cir. 2007) (asthma included in list of covered disabilities). As defined by one federal district court:

> Under the ADA effective prior to January 1, 2009, courts recognized that "[a]sthma can, in some cases, qualify as a disability[.]" *Boker v. Sec. Dept of Treasury*, No. 1:07-cv-446, 2009 U.S. Dist. LEXIS 90109, 2009 WL 3199074, *5 (S.D. Ohio Sept. 29, 2009).
> * * *
> However, under the ADA prior to January 1, 2009, simply "[s]uffering from asthma does not constitute a per se substantial limitation on the major life activity of breathing[.]" *Id.* Instead, asthma typically arose to the level of a disability in instances where "plaintiff has a long history of asthmatic attacks and endures numerous and severe restrictions on daily activities as a result of the condition." *Id.* If a person "suffer[ed] asthma attacks only in response to particular stimuli and [was] able to engage in almost all normal life activities, courts [were] . . . less likely to conclude that the plaintiff is substantially limited in the major life activity of

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 20 of 56

1     breathing."

2     *Core v. Champaign County Bd. of County Commissioners*, 26 Am. Disabilities Cas. (BNA) 1786,

3     at *11-*12 (S.D. Ohio 2012).  The evidence will show that Mrs. Hodges requires oxygen to be able

4     to breath properly.  The evidence will show that Mrs. Hodges has a long history of breathing

5     difficulties and that her asthma is not a recent diagnosis. The evidence will show that Mrs. Hodges's

6     asthma is a long-term chronic problem that requires continual monitoring.  It is something that

7     involves an occasional flare-up when exposed to particular, avoidable allergen.

8          Second, radiculopathy is generally recognized as a covered disability under the ADA.

9     Medical evidence of radiculopathy, i.e., a herniated disc, may be offered to support an ADA claim.

10    *Turner v. Hershey Chocolate USA*, 440 F.3d 604 (3d Cir. 2006); *see also Nuchman v. City of New*

11    *York*, Case No. 05-cv-4561, U.S. Dist. LEXIS 56256 (E.D.N.Y. 2009), and *Williams v. Affiliated*

12    *Foods Southwest, Inc.* Case No. 4-05-cv-00961, 2007 U.S. Dist. LEXIS 29899 (E.D. Ark. 2007).

13         Third, sarcoidosis also is a covered disability under the ADA.  Sarcoidosis is a systemic

14    inflammatory disease.  In *Benaugh v. Ohio Civil Rights Comm'n*, 278 Fed. Appx. 501, 20 Am.

15    Disabilities Cas. (BNA) 1374 (6th Cir. 2008), the Sixth Circuit upheld a jury award of damages to

16    a terminated employee who suffered from asthma and sarcoidosis and whose conditions worsened

17    as a result of the employer's failure to provide a reasonable accommodation to these conditions.

18         Mrs. Hodges cited medical conditions each are disabilities under the ADA.  The record

19    before this Court is clear that each affects major life activities such as breathing and mobility

20    (walking).  Thus, Mrs. Hodges has proffered evidence to satisfy the first prong of a claim of unlawful

21    disability-based discrimination, which is that she had a disability.

22         Mrs. Hodges also has offered evidence from which a factfinder could reasonably conclude

23    that she was performing her job satisfactorily immediately prior to her termination.  Mrs. Hodges

24    did not have a record of unsatisfactory performance.  To the contrary, up to the point immediately

25    prior to her termination, Mrs. Hodges had a record of satisfactory job performance.  She had been

26    promoted in title to the position of Senior Traffic Manager.  In fact, it is the employer who is

27    claiming that Mrs. Hodges had greater discretion and wider latitude over her job responsibilities,

28    which would be sufficient evidence from which satisfactory job performance may be inferred.

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 21 of 56

1    Finally, it is undisputed that Mrs. Hodges suffered an adverse job action, in that she was
2    terminated, and that she did not get the final accommodation that she had requested: a more
3    reasonable work schedule with reduced working hours, at an amount closer to a 40-hour work week,
4    which would allow her body to heal.  The adverse job action involved an unfounded accusation
5    concerning the use of FMLA leave within Mrs. Hodges's department.  Thus, due to the timing of
6    extending Mrs. Hodges's own intermittent FMLA leave request, and due to her employer's false
7    concerns about Mrs. Hodges's communications as to how others were to use and report FMLA time,
8    Mrs. Hodges's physical condition and disabilities could be inferred to be reasonably related to her
9    employer's termination decision.

10    Following the burden-shifting methodology used in employment discrimination cases, Mrs.
11    Hodges's former employer has proffered a reason for Mrs. Hodges's termination at that time.  Thus,
12    the burden of proof then shifts back to Mrs. Hodges.  Thus, the next step is to determine whether
13    there is sufficient evidence that the employer's stated reason for refusing to rehire Mrs. Hodges was
14    actually a pretext for unlawful discrimination:

> Under the ADA, when an employee establishes a prima facie case of
> discrimination because of a disability, and the employer provides a
> non-discriminatory reason for that discharge which "disclaims any
> reliance on the employee's disability in having taken the employment
> action," the analysis developed in *McDonnell Douglas* for suits under
> Title VII of the Civil Rights Act of 1964 applies.

19    *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001).  The plaintiff bears the
20    burden of persuasion as to whether the employer's stated reason for his termination was a pretext
21    for invidious discrimination.  *Id.*

22    Mrs. Hodges has offered testimony to support her position that the stated reason for her
23    termination – discouraging Estee Wright from using FMLA – was a pretext for unlawful
24    discrimination.  Mrs. Hodges had used intermittent FMLA without incident up until the time Ms.
25    Wright would have submitted the papers to use FMLA leave.   Mrs. Hodges would have had no
26    reason to say that the company would use it against her because FMLA usage had not yet been used
27    against Mrs. Hodges, although it soon would be.  Mrs. Hodges's statement about how she advised
28    Ms. Wright about entering FMLA-related leave into the computer-based time-tracking system ABRA

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 22 of 56

is credible and was not factually disputed by Maria Blondeaux, Mrs. Hodges's immediate superior. The employer should have known Mrs. Hodges was explaining time entry consistent with the ABRA software requirements and limitations.  Yet the employer nonetheless elected to fire Mrs. Hodges rather than accommodating her disability by reducing her work hours, or by allowing Mrs. Hodges to renew her FMLA leave.[6]  Thus, there is evidence in the record from which it may be concluded that GMG's termination decision was a pretext for unlawful disability-based discrimination.

GMG committed a further violation of the ADA by failing to give Mrs Hodges's the necessary reasonable accommodations mandated by law.  "An employer discriminates against a qualified individual with a disability by 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer." *Zivkovic v. Southern Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) (emphasis added) (quoting 42 U.S.C. § 12112(b)(5)(A).

According to the regulations of the Equal Employment Opportunity Commission ("EEOC"): "To determine the appropriate reasonable accommodation, it may be necessary for [the employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. §§ 1630.2(o)(3), *quoted in Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1111-1112 (9th Cir. 2000) (en banc), *vacated on other grounds, US Airways, Inc. v. Barnett*, 535 U.S. 391, 122 S. Ct. 1516, 152 L. Ed 2d 589 (2002).  "The interactive process is triggered either by a request for accommodation by a disabled employee or by the employer's recognition of the need for such an accommodation." *Barnett*, 228 F.3d at 1112.  Liability for failure to provide reasonable accommodations may ensue where the employer bears responsibility for the breakdown of this interactive process. *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996).

---

[6] A reduced or modified work schedule may be a reasonable accommodation under the ADA. 29 C.F.R. § 1630.2(o)(2)(ii).  This would include use of government-mandated leave time.

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 23 of 56

GMG initially accommodated Mrs. Hodges penny-ante requests for an accommodation. They eventually provided her with an ergonomic chair, albeit after a slow, lumbering process that took far too long. They provided her with a electric stapler, like her co-workers had, but when Mrs. Hodges's electric stapler broke, GMG refused to buy her a replacement. Accommodations which were slow in coming, and made grudgingly, soon were not made at all. Mrs. Hodges was told that her superior would not go to human resources and make any more requests for reasonable accommodations for Mrs. Hodges. Thus, when she requested a reduced work schedule, so that she would be working something closer to a 40-hour work week, she was fired.

GMG has argued that Mrs. Hodges termination in 2011 was wholly unrelated to Mrs. Hodges's expressed desire to reduce her working hours. But the record is clear that these two events happened in close proximity. A reasonable factfinder may well infer temporal proximity is evidence of cause-and-effect. A reasonable jury may well infer that Mrs. Hodges's request for a reduced work schedule promptly led to her termination on the flimsy grounds of discouraging Estee Wright from using FMLA. A reasonable jury may well infer that discouraging the coding of leave time as FMLA rather than PTO – even if that is what happened – is not grounds for termination under any reasonable set of circumstances and, therefore, the stated reason for termination was to avoid making another reasonable accommodation and was a pretext for invidious discrimination.

For these reasons, Mrs. Hodges should be allowed to proceed to trial on her federal and state claims of unlawful disability-based discrimination.

## C.

### Third and Fourth Claim For Relief:

### Defendant Unlawfully Harassed Mrs. Hodges and Discriminated Against Her Because She Is African-American

In addition, Donna Hodges has presented evidence to this Court that she has suffered unlawful harassment and discrimination on the basis of race in violation of both federal and Nevada law. Mrs. Hodges is African-American. "Nappy," in reference to the hair of an African-American, is derogatory and insulting. When she complained about a drawing of a can of "sloppy joe" mix caricatured to look like it had stereotypical African-American hair, with the word "sloppy" omitted

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

and the word "nappy" substituted, do that the can read "Nappy Joe," she was told she was not a "team player."[7]  She was told to get a "thicker skin."  And within a few weeks, she was fired.  While this "Nappy Joe" display may have been a one-time incident, Mrs. Hodges's complaints led to discipline being dispensed against her and, quite possibly, to her termination.

The third and fourth claims for relief pled by Mrs. Hodges involve allegations of unlawful race discrimination in the terms and conditions of Mrs. Hodges's employment.  Mrs. Hodges's third claim alleges unlawful race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17.  Her fourth alleges unlawful race discrimination and disparate treatment in violation of NRS 613.330(1).

Under Title VII, it is unlawful for an employer to discriminate against an employees based on race:

> It shall be an unlawful employment practice for an employer –
> (1)  to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's **race**, color, religion, sex, or national origin[.]

42 U.S.C. § 2000e-2(a) (emphasis added).  "A prima facie case of employment discrimination may be established through direct evidence of discriminatory intent **or** a presumption arising from a showing of objective factors such as those outlined in *McDonnell Douglas* and its progeny."  *Noyes v. Kelly Services*, 488 F.3d 1163, 1168 (9th Cir. 2007) (emphasis in original).

To survive summary judgment on a claim of disparate treatment, a plaintiff must establish that her job performance was satisfactory and "provide evidence, either direct or circumstantial, to support a reasonable inference that his termination was discriminatory."  *Peterson*, 358 F.3d at 603 (religious discrimination).  "The amount of evidence" that the plaintiff "must produce is 'very little,'" *id.* (quoting *Chuang*, 225 F.3d at 1124), "so long as it is more than 'purely conclusory

---

[7]  GMG claims that there was no poster labeled "Nappy Joe," but. instead, it was "Nappy Shannon."  The use of the racially derogatory term "Nappy" is conceded.  It is up to a jury to decide whether the use of the term "nappy" to describe a Caucasian female with long straight hair who appeared on what GMG claims was the insulting poster, has any credibility whatsoever.  (*See* Document GMG002699, attached as Exhibit 17)

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

allegations of alleged discrimination, with no concrete relevant particulars.'" *Peterson*, 358 F.3d at 603 (quoting *Forsberg*, 840 at 1419).

Employers engaged in systemic, invidious race discrimination rarely openly confess to an anti-black, racial animus. True motivations are not always expressed by the ultimate decision-maker. That is why the courts also allow plaintiffs to prove unlawful discrimination through indirect or circumstantial evidence.[8]

The primary method for establishing a claim of unlawful employment discrimination through circumstantial evidence is via the four-part test first enunciated in *McDonnell Douglas*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973). According to the Ninth Circuit:

---

[8] This Court has made it clear that "indirect," or circumstantial evidence of unlawful discrimination is no less credible or critical than direct evidence:

> The Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003), supports the principle that a plaintiff may rely successfully on either circumstantial or direct evidence to defeat a motion for summary judgment in a civil action under Title VII. *See Costa*, 539 U.S. at 92 (holding that a plaintiff does not have to produce direct evidence of discrimination to obtain a mixed-motive jury instruction under Title VII, and suggesting that a plaintiff suing under Title VII may prove his or her case using either circumstantial or direct evidence). ... As the Supreme Court confirmed, "direct evidence of discrimination is not required in mixed-motive cases." *Id.* at 101-02. The Supreme Court explained that "the reason for treating circumstantial and direct evidence alike is both clear and deep rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" *Id.* at 100 (quoting *Rogers v. Missouri P. R. Co.*, 352 U.S. 500, 508 n.17, 77 S. Ct. 443, 1 L. Ed. 2d 493 (1957)). The Supreme Court also observed that circumstantial evidence is routinely used to support criminal convictions, even though a conviction requires proof beyond a reasonable doubt. *See id*. And the Supreme Court noted that "juries are routinely instructed that 'the law makes no distinction between the weight or value to be given to either direct or circumstantial evidence.'" *Id.* (quoting 1A K. O'Malley, J. Grenig, & W Lee, Federal Jury Practice and Instructions, Criminal § 12.04 (5th ed. 2000)).

*Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029-30 (9th Cir. 2006).

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Under *McDonnell Douglas*, a plaintiff alleging disparate treatment under Title VII must first establish a prima facie case of discrimination. Specifically, the plaintiff must show that **(1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly situated individuals outside his protected class were treated more favorably**.

*Chuang*, 225 F.3d at 1123 (emphasis added).

"The burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Id.* at 1123-24. "If the employer does so, the plaintiff must show that the articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* at 1124 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095, 67 L. Ed. 2d 207 (1981)). Again, whether through direct or circumstantial, the amount of evidence that must be produced to establish a prima facie case is "very little." *Sischo-Nownejad v. Merced Community Coll. Dist.*, 934 F.2d 1104, 1110-11 (9th Cir. 1991).

Mrs. Hodges has offered evidence sufficient to establish a prima facie case of unlawful discrimination on the basis of race, the first step in proving a Title VII violation through indirect evidence. First, Mrs. Hodges is indisputably African-American. Second, she was qualified for her position. Her evaluations reflect that she performed at an acceptable level. She had not been disciplined for poor performance. She had been promoted in title to the position of Senior Traffic Manager. Third, she was disciplined for complaining about the "Nappy Joe" announcement and quickly fired. Fourth, she was replaced by an able-bodied Caucasian, Estee Wright.

Once Mrs. Hodges has established a prima facie case of unlawful discrimination, either through direct or circumstantial evidence, and once his employer has articulated a non-discriminatory reason for its actions, the burden then shifts back to Mrs. Hodges, as the employee, to prove that the stated reason was merely a pretext for unlawful discrimination. According to the Ninth Circuit:

[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is "**unworthy of credence**" because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 27 of 56

> more likely **motivated** the employer. These two approaches are not exclusive; a combination of the two kinds of evidence may in some cases serve to establish pretext so as to make summary judgment improper.

*Chuang*, 225 F.2d at 1127 (emphasis added) (quoting *Godwin*, 150 F.3d at 1220-22). "An employee 'may offer evidence, direct or circumstantial, 'that a discriminatory reason more likely motivated the employer' to make the challenged employment decision.'" *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1091 (9th Cir. 2008) (quoting *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006)). Alternatively, "Employees may rely on both circumstantial and direct evidence because '[d]efendants who articulate a nondiscriminatory explanation for a challenged employment decision may have been careful to construct an explanation that is not contradicted by known direct evidence.'" *Davis*, 520 F.3d at 1091 (quoting *Cornwell*, 439 F.3d at 1029).

An employer's stated reason may well have been carefully constructed in the context of litigation to escape liability for unlawful discrimination. In order to determine if such a reason was pretextual, the court often must review of the same evidence initially used to establish a prima facie case of invidious discrimination:

> In order to show a prima facie case of discrimination, "a plaintiff must offer evidence that gives rise to an inference of unlawful discrimination." The evidence may be either direct or circumstantial, and the amount that must be produced in order to create a prima facie case is "very little." **Normally, when such evidence has been introduced, a court should not grant summary judgment to the defendant on any ground relating to the merits.** Even if the defendant articulates a legitimate, nondiscriminatory reason for the challenged employment decision, thus shifting the burden to the plaintiff to prove that the articulated reason is pretextual, summary judgment is normally inappropriate. "**When a plaintiff has established a prima facie inference of disparate treatment through direct or circumstantial evidence of discriminatory intent, he will necessarily have raised a genuine issue of material fact with respect to the legitimacy or bona fides of the employer's articulated reason for its employment decision.**" Specifically, in evaluating whether the defendant's articulated reason is pretextual, the trier of fact must, at a minimum, consider the same evidence that the plaintiff introduced to establish her prima facie case. When that evidence, direct or circumstantial, consists of more than the *McDonnell Douglas* presumption, **a factual question will almost always exist with respect to any claim of a nondiscriminatory reason**.

*Sischo-Nownejad*, 934 F.2d at 1110-11 (emphasis added) (citations omitted).

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 28 of 56

GMG claims that it fired Mrs. Hodges for discouraging Ms. Wright from using FMLA. There is sufficient evidence in the record from which it may be inferred that GMG's stated reason is unworthy of credence. Up until that point, Mrs. Hodges had applied for intermittent FMLA and had been able to use it without incident. Ms. Wright applied for, and used, FMLA. Thus, there was no actual blocking of FMLA use that occurred. Mrs. Hodges stated that she merely explained to Ms. Wright how her time should be entered into "ABRA," the company's timekeeping software, while using FMLA. Mrs. Hodges is adamant that she had no discussions with Ms. Wright over whether or not FMLA should be used or whether its use would be prudent. That position is disputed by GMG and, thus, is yet another material fact that is genuinely in dispute.

Thus, it is reasonable to infer that there is no basis for the assertion that Mrs. Hodges actively discouraged Ms. Wright from using FMLA. However, there is a reasonable basis in the record to infer that, even if this had happened, it was not a firing offense.

Mrs. Hodges had been able to use FMLA without incident. Maria Blondeaux, Mrs. Hodges's superior, used FMLA without incident. Thus, it would be reasonable for a factfinder to infer that Mrs. Hodges's communications to Ms. Wright about FMLA were not the reason for the termination, but instead it was the brouhaha over a racist poster that offended Mrs. Hodges and which Mrs. Hodges forcefully raised her complaint up the chain of command.

Mrs. Hodges complained about what she perceived to be a racially offensive poster. She was told, instead, to grow a thicker skin. And she was promptly fired before she even had the opportunity to grow such a thicker skin. This is sufficient for a reasonable factfinder to infer invidious race-based discrimination. This is sufficient to allow Mrs. Hodges claims of unlawful race discrimination to proceed to trial.

### D.

### Fifth Claim For Relief:

### Defendant Unlawfully Violated Mrs. Hodges Civil Rights under 42 U.S.C. § 1981

Mrs. Hodges also is entitled to proceed on her fifth claim for relief, in which she has pled that GMG's actions were unlawful under the Civil Rights Act of 1866, as amended. Mrs. Hodges has alleged that Defendant denied her the same right to make and enjoy the terms of a contract of

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 29 of 56

employment as was provided to white employees in the Traffic Department and at GMG as a whole; therefore, GMG violated Mrs. Hodges's civil rights under 42 U.S.C. § 1981.

Under the terms of the Civil Rights Act of 1866, as amended, African-Americans enjoy the same right to the full and equal benefits of the laws of this nation as do the majority population:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to **make and enforce contracts**, to sue, be parties, give evidence, and to **the full and equal benefit of all laws** and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). As defined at 42 U.S.C. § 1981(b): "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." This includes contracts of employment, as an at-will employment relationship is contractual and may serve as the contract necessary for stating a claim under 42 U.S.C. § 1981. *Perry v. Woodward*, 199 F.3d 1126, 1133 (10th Cir. 1999).

Under well-settled law, "When § 1981 is used as a basis for relief parallel to that provided by Title VII, the elements of a § 1981 claim are identical to the elements of a Title VII claim." *Walters v. City of Atlanta*, 803 F.2d 1135, 1143 (11th Cir. 1986) (citing *Whiting v. Jackson State Univ.*, 616 F.2d 116, 121 (5th Cir. 1980)). According to the Ninth Circuit:

> Title VII prohibits employers from discriminating against an individual based on race. 42 U.S.C. § 2000e-2(a)(1) (2003). Similarly, § 1981 prohibits discrimination in the "benefits, privileges, terms and conditions" of employment. 42 U.S.C. § 1981(b); *Metoyer v. Chassman*, 504 F.3d 919, 935 (9th Cir. 2007). When analyzing § 1981 claims, we apply "the same legal principles as those applicable in a Title VII disparate treatment case." *Id.* at 930 (quoting *Fonseca v. Sysco Food Servs. of Ariz. Inc.*, 374 F.3d 840, 850 (9th Cir. 2004). Title VII, however, "requires the plaintiff to exhaust administrative remedies, such as filing a claim with the EEOC[,] before seeking a private action for damages, whereas § 1981 has no such requirement." *Id.* at 947 n.11 (Bea, J., dissenting) (citing 42 U.S.C. § 2000e-5(f)).

*Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008).

For the same reasons that Defendant is liable to Mrs. Hodges for race discrimination under Title VII, GMG likewise is liable to Mrs. Hodges for depriving her of her civil rights under 42

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 30 of 56

U.S.C. § 1981.  Mrs. Hodges has offered evidence to show that she was denied the "benefits, privileges, terms and conditions" of employment in violation of the Civil Rights Act of 1866, as amended, and as codified at 42 U.S.C. § 1981.  Therefore, for the reasons that Mrs. Hodges is entitled to proceed to trial on his claim for damages under 42 U.S.C. § 2000e-2(a), she is likewise entitled to proceed on her claim arising under this still-necessary Reconstruction-era civil rights law.

**E.**

**Sixth and Seventh Claims For Relief:**

**Defendant Unlawfully Retaliated Against Mrs. Hodges by Terminating Her**
**for Objecting to Discriminatory and Disparate Treatment**

A factfinder also reasonably could infer from the evidence presented that Mrs. Hodges was subjected to unlawful retaliation because of her requests for accommodations and her complaints of racially-inappropriate communications being disseminated throughout her department.  Mrs. Hodges's Complaint set forth two claims based on unlawful retaliation.  In her sixth claim for relief, she is seeking damages based on retaliation for objecting to unlawful discrimination in violation of federal law.  In her seventh claim, she is seeking damages for retaliation under NRS 613.340(1).

Title VII and Nevada law not only outlaw employment discrimination.  They also outlaw retaliation against an employee who has objected to sex discrimination in employment:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this title or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title.

42 U.S.C. § 2000e-3(a); *see also* NRS 613.340(1).[9]

---

[9] According to NRS 613.340(1):
> It is an unlawful employment practice for an employer to discriminate against any of his or her employees or applicants for employment[,] because the employee ... has opposed any practice made an unlawful

(continued...)

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 31 of 56

Likewise, unlawful retaliation is prohibited under the ADA, which states:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a).

In adjudicating claims of unlawful retaliation under federal law, courts apply the same burden-shifting approach used in *Burdine* for cases arising under 42 U.S.C. § 2000e-2(a). "In order to make out a prima facie case of retaliation, a plaintiff must show that (1) she was engaging in a protected activity, (2) the employer subjected her to an adverse employment decision, and (3) there was a causal link between the protected activity and the employer's action." *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1140 (9th Cir. 2001) (retaliation for objecting to sex discrimination). "Causation sufficient to establish the third element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.3d 1371, 1376 (9th Cir. 1987). As with claims of employment discrimination, "[o]nce established, the burden shifts to the defendant to set forth a legitimate, non-retaliatory reason for its actions; at that point, the plaintiff must produce evidence to show that the stated reasons were a pretext for retaliation." *Surrell*, 518 F.3d at 1108(9th Cir. 2008).

Mrs. Hodges has proffered evidence sufficient to establish a prima facie case of unlawful retaliation. First, she was engaged in a protected activity. She complained to Ms. Blondeaux about the racially-insensitive "Nappy Joe" Potluck. The racial harassment was not addressed; instead,

---

[9](...continued)
> employment practice by NRS 613.310 to 613.435, inclusive, or because he or she has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under NRS 613.310 to 613.435, inclusive.

Under NRS 613.330(1), as referenced by this statute, discrimination on the basis of race or disability is prohibited under Nevada law.

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 32 of 56

Mrs. Hodges was told to be more of a "team player" and to grow a "thicker skin."  Mrs. Hodges attempted to procure reasonable accommodations under the ADA.  She was told that she could bring forward no requests for reasonable accommodations under the ADA.  She was not even given a replacement for an electric stapler once it broke.

Second, Mrs. Hodges was subjected to adverse employment decisions.  She was lectured, disciplined and eventually fired.

Third, there was a "causal link" between the protected activity and the adverse job consequences.  "To establish a causal link," an employee must show that her employer "was aware of her involvement in a protected activity."  *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982), *quoted in Carrasco v. San Ramon Valley Unified School Dist.*, 258 Fed. Appx. 114, 115 (9th Cir. 2007).  Mrs. Hodges's employer knew of her complaints.  And the complaints about "Nappy Joe," and the discussions in which she was told she could make no more reasonable accommodations, occurred very soon before her termination in early 2011.

"Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases." *Bell v. Clackamas County*, 341 F.3d 858, 865 (9th Cir. 2003).  How temporally close must be the retaliation and the opposition to survive summary judgment?  The Ninth Circuit Court has "cautioned that a 'specified time period cannot be a mechanically applied criterion. A rule any period over a certain time is per se too long (or, conversely, a rule that any period under a certain time is per se short enough) would be unrealistically simplistic.'" *Porter v. California Dep't of Corrections*, 419 F.3d 885, 895 (9th Cir. 2005) (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 977-78 (9th Cir. 2003)).

The Ninth Circuit has held that "three to eight months is easily within the time range that supports an inference of retaliation." *Coszalter*, 320 F.3d at 977.  Even "an eleven-month gap in time is within the range that has been found to support an inference that an employment decision was retaliatory." *Allen v. Iranon*, 283 F.3d 1070, 1078 (9th Cir. 2002).  As the Ninth Circuit has repeatedly held, "proximity in time, however, must be considered in the context of the factual situation, and it **should be left to the jury** to determine whether the inference alone is sufficient to find a violation." *Pena v. Bjorndahl*, 177 Fed. Appx. 666, 667 (9th Cir. 2006) (unlawful retaliation

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 33 of 56

for exercise of First Amendment rights) (emphasis added).

Mrs. Hodges raised complaints about her working environment, complaints that were protected under Title VII, under the ADA, and under NRS 613.340(1). She was lectured about making complaints and within a very short time she was fired. This is sufficient evidence from which an inference of unlawful retaliation may reasonably be drawn.

**F.**

**Eighth Claim For Relief:**

**Defendant Unlawfully Interfered with Mrs. Hodges's Rights
under the Family and Medical Leave Act**

Temporal proximity is again the touchstone of Mrs. Hodges's interference claim under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2611-2654. Mrs. Hodges announced that she would be renewing her papers for intermittent FMLA leave. Soon thereafter, she was fired. GMG contends that it fired Mrs. Hodges in order to prevent her from interfering with the rights of Estee Wright, one of Mrs. Hodges's co-workers, from taking FMLA leave. Mrs. Hodges contends that it was her rights under the FMLA that were subjected to unlawful interference. That question should be one for the jury to decide.

Under the FMLA, every "eligible employee" is entitled to 12 weeks of unpaid leave during any 12-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."[10] 29 U.S.C. § 2612(a)(1)(D). According to the Ninth Circuit:

> The FMLA creates two interrelated substantive rights for employees. *Bachelder v. America West Airlines*, 259 F.3d 1112, 1122 (9th Cir. 2001). First, an employee has the right to take up to twelve weeks of leave for the reasons described above. 29 U.S.C. § 2612(a). Second, **an employee who takes FMLA leave has the right to be restored to his or her original position or to a position equivalent in benefits, pay, and conditions of employment upon return** from

---

[10] To be an "eligible employee," an employee must have worked for her employer for at least 12 months, and must have worked a minimum of 1,250 hours during the preceding year. 29 U.S.C. § 2611(2)(A). The definition of "eligible employee" excludes any employee assigned to a worksite in which there are less than 50 employees within a 75-mile radius of that worksite. 29 U.S.C. § 2611(2)(B)(ii).

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 34 of 56

leave.  29 U.S.C. § 2614(a).  The FMLA does not entitle the employee to any rights, benefits, or positions they would not have been entitled to had they not taken leave. 29 U.S.C. § 2614(a)(3)(B). It simply **guarantees that an employee's taking leave will not result in a loss of job security or in other adverse employment actions**.

*Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003) (emphasis added).

"To protect the employee, FMLA prohibits interference with the exercise of the employee's right to take leave." *Liu*, 347 F.3d at 1132.  As the Ninth Circuit observed:

[T]he established understanding at the time the FMLA was enacted was that employer actions that deter employees' participation in protected activities constitute "interference" or "restraint" with the employees' exercise of their rights.  Under the FMLA[,] attaching negative consequences to the exercise of protected rights surely "tends to chill" an employee's willingness to exercise those rights:  **Employees are, understandably, less likely to exercise their FMLA leave rights if they can expect to be fired or otherwise disciplined for doing so.**

*Bachelder v. America West Airlines*, 259 F.3d 1112, 1124 (9th Cir. 2001) (emphasis added).

"Interference claims," as pled by Mrs. Hodges, differ from pure "retaliation claims" under the FMLA:

To preserve the availability of these rights, and to enforce them, the FMLA creates two types of claims: **interference claims**, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, *see* 29 U.S.C. § 2615(a)(1), and **retaliation claims**, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act, *see* 29 U.S.C. § 2615(a)(1)-(2); 29 C.F.R. § 825.220(c) ("An employer is prohibited from discriminating against employees … who have used FMLA leave.").  **To state a claim of interference with a substantive right, an employee need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied.**  *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1353-54 (11th Cir. 2000); *King v. Preferred Technical Group*, 166 F.3d 887, 891 (7th Cir.1999).  In contrast, to succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right.  *King*, 166 F.3d at 891.

*Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1206-07 (11th Cir. 2001) (emphasis added).

The distinction is subtle, but critically important.  Terminating an employee for exercising FMLA rights is deemed an unlawful "interference" under the FMLA in violation of 29 U.S.C.

THE  LAW  OFFICES  OF
ROBERT P. SPRETNAK
A  PROFESSIONAL  CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 35 of 56

1  § 2615(a)(1).[11]  *Bachelder*, 259 F.3d at 1124 ("By their plain meaning, the anti-retaliation or anti-

2  discrimination provisions do not cover visiting negative consequences on an employee simply

3  because he has used FMLA leave. Such action is, instead, covered under § 2615(a)(1), the provision

4  governing 'Interference [with the] Exercise of Rights.'").[12]  This is because the direct application of

5  negative job consequences interferes with, and chills, the exercise of FMLA rights.  On the other

6  hand, unlawful retaliation in violation of 29 U.S.C. § 2615(a)(2) occurs when an employee suffers

7  an adverse job consequence as a result of objecting to an FMLA violation.[13]

8        The evidence presented is sufficient for a reasonable factfinder to conclude that GMG

9  unlawfully interfered with Mrs. Hodges's right to renew her request for intermittent leave under the

10  FMLA.  GMG is a covered employer under the FMLA.  After all, this is evident from their behavior

11  as they claim to have fired Mrs. Hodges because she attempted to interfere with a co-worker's

12  FMLA rights.  Mrs. Hodges announced her intent to exercise her rights under the FMLA and she was

13  promptly fired.  GMG claims there is no relationship between those two events and it should be the

14  province of the jury to decide whether that is, indeed, the case.

15        For these reasons, Mrs. Hodges should be allowed to proceed with her claim for unlawful

16  interference under the FMLA.

17

18

19  _____

20        [11]  "It shall be unlawful for any employer to **interfere** with, restrain, or deny the exercise of

21  or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1) (emphasis added).

22        [12]  The distinction between "interference" and "retaliation" claims does not depend on how

23  the claim has been plead under the notice pleading under the Federal Rules of Civil Procedure. According to the Ninth Circuit, whether a claim has been pled as an unlawful interference claim

24  under 29 U.S.C. § 2615(a)(1), or an unlawful retaliation claim under 29 U.S.C. § 2615(a)(2) is not important under the rules of notice pleading, as the courts of the circuit will make the determination

25  as to the proper FMLA subsection under which the plaintiff should proceed.  *Rexwinkel v. Parsons*,

26  162 Fed. Appx. 698, 700 (9th Cir. 2006).

27        [13]  "It shall be unlawful for any employer to discharge or in any other manner discriminate

28  against any individual for opposing any practice made unlawful by this subchapter."  29 U.S.C. § 2615(a)(2).

THE  LAW  OFFICES  OF
ROBERT P. SPRETNAK
A  PROFESSIONAL  CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 36 of 56

## G.

### Ninth Claim For Relief:

### Defendant Failed to Pay Mrs. Hodges Earned Overtime Compensation
### During the Time She Was Employed as a Senior Traffic Manager

Unrelated to, and wholly discrete from, Mrs. Hodges's claims arising from her termination, Mrs. Hodges also is seeking damages based on the failure of GMG to compensate her for all hours worked over 40 in each workweek during the three-year period prior to the filing of this Complaint. The validity of this claim is not dependent on a discriminatory motive, nor can it be destroyed by "after acquired" evidence.

Mrs. Hodges did not work a precise 40-hour work week.[14]  Her colleagues knew that she arrived early, often before them, and stayed late, often after them.  She routinely worked weekends. Mrs. Hodges estimated that she worked well over a 70-hour workweek.[15]

---

[14]  GMG computer records would have been able to verify or refute this, but were not produced in discovery or are otherwise no longer available.

[15]  The fact that Mrs. Hodges did not retain precise timekeeping records of her overtime will not be material to this disposition of this case.  The employee does not bear the burden of proof to show that she worked a specific, precise number of hours in excess of 40 each work week. According to the United States Supreme Court:

> When the employer has kept proper and accurate records, the employee may easily discharge his burden by securing the production of those records.  But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes, a more difficult problem arises.  **The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work.**  Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act.  In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  The burden then shifts to the employer to come forward with evidence of the precise

(continued...)

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

The Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, requires the payment of overtime compensation at a rate of one and one-half times the regular pay rate for all hours that each and every employee works over 40 in a workweek.  According to 29 U.S.C. § 207(a)(1):

> Except as otherwise provided in this section, **no employer shall employ any of his employees** who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, **for a workweek longer than forty hours unless such employee receives compensation for his employment** in excess of the hours above specified **at a rate not less than one and one-half times the regular rate** at which he is employed.

(Emphasis added).

It is undisputed that Mrs. Hodges was not paid overtime compensation.  It is clearly evident from the records that Mrs. Hodges worked longer than 40-hour workweeks for which she received no additional compensation.  GMG does not contend that Mrs. Hodges was fully compensated for overtime pay at the applicable premium.  Instead, GMG contends that it had no duty to pay Mrs. Hodges for any hours worked in excess of 40 because Mrs. Hodges was a salaried employee whose position was exempt from the requirements of the FLSA.

Under the FLSA, an employer must pay the overtime compensation mandated by 29 U.S.C. § 207 to covered employees unless at least one of the specific "exemptions" set forth at 29 U.S.C. § 213 applies.  An employee working in one of the following job categories is exempt from the overtime compensation requirement of 29 U.S.C. § 207, as well as the "minimum wage" requirement of 29 U.S.C. § 206:

---

[15](...continued)
> amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. **If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.**

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88, 66 S. Ct. 1187, 1192, 90 L. Ed. 1515 (1946) (emphasis added).  Thus, according to a well-settled line of authority, it is the employer, not the employee, who is obligated to maintain timekeeping records.  An employee is not punished for an employer's lack of record-keeping;  the burden is on the employer to show that the employee is providing a fallacious estimate of his actual working hours.

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

(1) any employee employed in a bona fide **executive**, **administrative**, or **professional** capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman[;] or

* * *

"(3) any employee employed by an establishment which is an amusement or recreational establishment, organized camp, or religious or non-profit educational conference center[;] or

* * *

(5) any employee employed in the catching, taking, propagating, harvesting, cultivating, or farming of any kind of fish, shellfish, crustacea, sponges, seaweeds, or other aquatic forms of animal and vegetable life, or in the first processing, canning or packing such marine products at sea as an incident to, or in conjunction with, such fishing operations, including the going to and returning from work and loading and unloading when performed by any such employee; or

(6) any employee employed in agriculture[;] or

(7) any employee to the extent that such employee is exempted by regulations, order, or certificate of the Secretary issued under section 214 of this title; or

(8) any employee employed in connection with the publication of any weekly, semiweekly, or daily newspaper with a circulation of less than four thousand the major part of which circulation is within the county where published or counties contiguous thereto; or

* * *

(10) any switchboard operator employed by an independently owned public telephone company which has not more than seven hundred and fifty stations; or

* * *

(12) any employee employed as a seaman on a vessel other than an American vessel; or

* * *

(15) any employee employed on a casual basis in domestic service employment to provide babysitting services or any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary); or

(16) a criminal investigator who is paid availability pay[;] or

(17) any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker[.]

29 U.S.C. § 213(a) (emphasis added).[16]  Thus, an employer may not be required to pay additional overtime compensation for employees working in any one of the above job categories.

In addition, an employee working in one of the following job categories is exempt from the

---

[16]  This is a complete list of the exemption categories under 29 U.S.C. § 213(a).  The only enumerated sub-categories omitted from the above list were sub-categories that have been statutorily repealed.

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 39 of 56

overtime compensation requirement of 29 U.S.C. § 207 (but not the minimum wage mandate of 29 U.S.C. § 206):

        (1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of title 49; or

        (2) any employee of an employer engaged in the operation of a rail carrier[;] or

        (3) any employee of a carrier by air subject to the provisions of title II of the Railway Labor Act [45 U.S.C. 181 et seq.]; or

        * * *

        (5) any individual employed as an outside buyer of poultry, eggs, cream, or milk, in their raw or natural state; or

        (6) any employee employed as a seaman; or

        * * *

        (9) any employee employed as an announcer, news editor, or chief engineer by a radio or television station the major studio of which is located

        (A) in a city or town of one hundred thousand population or less[,] or

        (B) in a city or town of twenty-five thousand population or less, which is part of such an area but is at least 40 airline miles from the principal city in such area; or

        (10) (A) any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trucks, or farm implements, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles or implements to ultimate purchasers; or

        (B) any salesman primarily engaged in selling trailers, boats, or aircraft, if he is employed by a nonmanufacturing establishment primarily engaged in the business of selling trailers, boats, or aircraft to ultimate purchasers; or

        (11) any employee employed as a driver or driver's helper making local deliveries, who is compensated for such employment on the basis of trip rates, or other delivery payment plan[;] or

        (12) any employee employed in agriculture or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways, not owned or operated for profit, or operated on a sharecrop basis, and which are used exclusively for supply and storing of water, at least 90 percent of which was ultimately delivered for agricultural purposes during the preceding calendar year; or

        (13) any employee with respect to his employment in agriculture by a farmer, notwithstanding other employment of such employee in connection with livestock auction operations in which such farmer is engaged as an adjunct to the raising of livestock, either on his own account or in conjunction with other farmers, if such employee

        (A) is primarily employed during his workweek in agriculture by such farmer, and

        (B) is paid for his employment in connection with such livestock auction operations at a wage rate not less than that prescribed by section 206 (a)(1) of this title; or

        (14) any employee employed within the area of production (as defined by the Secretary) by an establishment commonly recognized as a country elevator, including such an establishment which sells

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

products and services used in the operation of a farm, if no more than five employees are employed in the establishment in such operations; or

(15) any employee engaged in the processing of maple sap into sugar (other than refined sugar) or syrup; or

(16) any employee engaged

(A) in the transportation and preparation for transportation of fruits or vegetables, whether or not performed by the farmer, from the farm to a place of first processing or first marketing within the same State, or

(B) in transportation, whether or not performed by the farmer, between the farm and any point within the same State of persons employed or to be employed in the harvesting of fruits or vegetables; or

(17) any driver employed by an employer engaged in the business of operating taxicabs; or

* * *

(20) any employee of a public agency who in any workweek is employed in fire protection activities or any employee of a public agency who in any workweek is employed in law enforcement activities (including security personnel in correctional institutions), if the public agency employs during the workweek less than 5 employees in fire protection or law enforcement activities, as the case may be; or

(21) any employee who is employed in domestic service in a household and who resides in such household; or

* * *

(24) any employee who is employed with his spouse by a nonprofit educational institution to serve as the parents of children –

(A) who are orphans or one of whose natural parents is deceased, or

(B) who are enrolled in such institution and reside in residential facilities of the institution,

while such children are in residence at such institution, if such employee and his spouse reside in such facilities, receive, without cost, board and lodging from such institution, and are together compensated, on a cash basis, at an annual rate of not less than $10,000; or

* * *

(27) any employee employed by an establishment which is a motion picture theater; or

(28) any employee employed in planting or tending trees, cruising, surveying, or felling timber, or in preparing or transporting logs or other forestry products to the mill, processing plant, railroad, or other transportation terminal, if the number of employees employed by his employer in such forestry or lumbering operations does not exceed eight; [or]

(29) any employee of an amusement or recreational establishment located in a national park or national forest or on land in the National Wildlife Refuge System if such employee

(A) is an employee of a private entity engaged in providing services or facilities in a national park or national forest, or on land in the National Wildlife Refuge System, under a contract with the Secretary of the Interior or the Secretary of Agriculture, and

(B) receives compensation for employment in excess of fifty-six hours in any workweek at a rate not less than one and one-half times

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 41 of 56

the regular rate at which he is employed; or
(30) a criminal investigator who is paid availability pay[.]

29 U.S.C. § 213(b).[17]  Again, an employer is not required to pay additional overtime compensation for employees working in any one of the above additional job categories.

GMG must prove as a matter of law that Mrs. Hodges's position of Senior Traffic Manager was properly exempted from the overtime pay requirements of the FLSA.  "**An employer who claims an exemption from the FLSA bears the burden of demonstrating that the exemption applies.**"  *Klem v. County of Santa Clara*, 208 F.3d 1085, 1089 (9th Cir. 2000) (emphasis added).  "Exemptions to the FLSA are to be **narrowly construed**, and the employer bears the burden of proof to show 'the employees fit 'plainly and unmistakenly within the exemption's terms.'"  *SEIU, Local 102 v. County of San Diego*, 60 F.3d 1346, 1350 (9th Cir. 1994) (emphasis added).  According to the Ninth Circuit:

> Exemptions to FLSA are to be narrowly construed in order to further Congress' goal of providing broad federal employment protection. *Mitchell v. Lublin, McGaughy & Assoc.*, 358 U.S. 207, 211, 3 L. Ed. 2d 243, 79 S. Ct. 260 (1959)[.]  **Employers who claim that an exemption applies** to their employees **not only have the burden of proof**, *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97, 94 S. Ct. 2223, 41 L. Ed. 2d 1 (1974), but **they must show that the employees fit** "**plainly and unmistakenly** within [the exemption's] terms." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 4 L. Ed. 2d 393, 80 S. Ct. 453 (1960).

*Abshire v. County of Kern*, 908 F.2d 483, 485-86 (9th Cir. 1990) (emphasis added), *cert. denied*, 498 U.S. 1068, 111 S. Ct. 785, 112 L. Ed. 2d 848 (1991).

**GMG, as Mrs. Hodges's employer, must prove that it had no legal obligation to compensate Mrs. Hodges for work performed in excess of 40 per work week**.  GMG cannot establish as a matter of law that any of these exemption categories absolves it of the duty and obligation to pay Mrs. Hodges overtime compensation at a premium rate for all hours worked over 40 in each covered workweek.

---

[17]  As with the list of enumerated sub-categories under 29 U.S.C. § 213(a), this is a complete list of the exemption categories under 29 U.S.C. § 213(b).  Again, the only enumerated sub-categories omitted from the above list were sub-categories that have been statutorily repealed.

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 42 of 56

**1.     Mrs. Hodges Was Not Employed in an Executive or Supervisory Position**

The exemption for employees working "in a bona fide **executive** capacity" does not apply to Mrs. Hodges's circumstances.  According to 29 C.F.R. § 541.100(a):

> (a) The term "employee employed in a bona fide executive capacity" in [29 U.S.C. § 213(a)(1)] shall mean any employee:
> (1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
> (2) Whose **primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department** or subdivision thereof;
> (3) Who **customarily and regularly directs the work of two or more other employees**; and
> (4) Who has the **authority to hire or fire** other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

(Emphasis added).

"Supervisor" and "manager" are vaguely defined terms under the law.  According to 29 C.F.R. § 541.102, the following non-exhaustive list illustrates the type of activities constituting "management":

> [A]ctivities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

This does not describe the work of Mrs. Hodges.  She could not hire.  She could not fire.  She did not interview new employees.  She had no input into employee compensation.  She did not maintain production records regarding the work of his fellow employees.  While she did draft performance appraisals, those had to be approved by Ms. Blondeaux.  She did not formally handle employee complaints or grievances.  She had no authority to discipline his co-workers.  She did not

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 43 of 56

plan the work of any co-workers.  She could not unilaterally apportion work among her fellow employees.  She had absolutely no authority or discretion to determine "the type of materials, supplies, machinery, equipment or tools to be used" in the build-out.  She had no role in budgeting. She did not have any duties pertaining to legal compliance.  Quite simply, her job duties were not supervisory or managerial as defined in 29 C.F.R. § 541.102.

In a very recent case involving allegations of race-based harassment in violation of Title VII, the United States Supreme Court clarified and simplified the definition of "supervisor."  A few weeks ago, in *Vance v. Ball State Univ.*, __ U.S. __, 133 S. Ct. 2434, 186 L. Ed. 2d 565 (2013), the Supreme Court took notice of the increasingly common trend of having valued employees take on some of the duties associated with supervision without that employee having final say in personnel matters.  In essence, the Supreme Court took notice of the increasing blurring of the line between supervision and the rank-and-file.

The touchstone element of whether a person has the status of "supervisor" is whether that person has the authority to take a tangible employment action against a co-worker.  *Id.*, 133 S. Ct. at 2441-42.  "When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation[.]  A tangible employment decision requires an official act of the enterprise, a company act.  The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors."  *Id.*, 133 S. Ct. at 2442. Hallmarks of supervisory status are "power to hire, fire, demote, promote, transfer, or discipline." *Id.*, 133 S. Ct. at 2443.

Mrs. Hodges did not have authority to hire or fire.[18]  She could not demote or promote or discipline.  She merely drafted performance reviews.  She was tangentially involved in interviewing, although she was never a decisionmaker.  She drafted performance reviews, but her drafts had to be approved by Ms. Blondeaux.  This is consistent with the idea that some functions were delegated,

---

[18]   Any argument that Mrs. Hodges had unilateral authority to hire or fire is called into question by the fact that, according to GMG, the decision to terminate Mrs. Hodges had to be approved by multiple layers of decisionmakers within the organization.  GMG is offering a version of events that, in essence, claims that a Senior Traffic Manager was the only person that could be identified as having authority to unilaterally hire and fire.

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 44 of 56

1   but that basic supervisory authority at all times rested with Ms. Blondeaux.

2        It also is not probative evidence, let alone dispositive evidence, that Mrs. Hodges's job title

3   included the word "manager."  As one court pithily observed with regard to this nation's overtime

4   laws, "Job titles by themselves determine nothing."  *Harris v. Superior Court of Los Angeles County*,

5   64 Cal. Rptr. 3d 547, 566 (Cal. Ct. App. 2007).  According to that California court, which also was

6   applying the FLSA, "A title alone is of little or no assistance in determining the true importance of

7   an employee to the employer or his exempt or nonexempt status."  *Id.*

8        Mrs. Hodges's title is not relevant.  Her job duties are.  GMG is unable to carry its burden

9   of proof that this exemption applies as a matter of law.  Thus, there is evidence in the record from

10  which it reasonably may be concluded that Mrs. Hodges was not exempted from the overtime

11  requirements of the FLSA because of employment in a "bona fide executive position."

12  **2.    Mrs. Hodges Was Not Employed in an Administrative Capacity**

13       In addition, the exemption for employees working "in a bona fide **administrative** capacity"

14  does not protect GMG from its obligation to have paid Mrs. Hodges for her overtime work.

15       This is the most ambiguous of all the exemption categories.  According to 29 C.F.R.

16  § 541.200(a):

17           The term "employee employed in a bona fide administrative capacity"
             in [29 U.S.C. § 213(a)(1)] shall mean any employee:
18           (1) Compensated on a salary or fee basis at a rate of not less than
             $455 per week (or $ 380 per week, if employed in American Samoa
19           by employers other than the Federal Government), exclusive of board,
             lodging or other facilities;
20           (2) Whose **primary duty is the performance of office or non-
             manual work** directly related to the management or **general
21           business operations** of the employer or the employer's customers;
             and
22           (3) Whose primary duty includes the **exercise of discretion and
             independent judgment** with respect to matters of significance.
23
24  (Emphasis added).  The key terms of this exemption are defined as follows:

25           (a) To qualify for the administrative exemption, an employee's
             primary duty must be the performance of work directly related to the
26           management or general business operations of the employer or the
             employer's customers.   The phrase "directly related to the
27           management or general business operations" refers to the type of
             work performed by the employee.  **To meet this requirement, an
28           employee must perform work directly related to assisting with the**

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

1

> **running or servicing of the business**, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

2

29 C.F.R. § 541.201(a) (emphasis added).  For example:

3

4

> Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. Some of these activities may be performed by employees who also would qualify for another exemption.

5

6

7

8

9

29 C.F.R. 541.201(b).[19]

10

According to the Ninth Circuit, "the employee's 'primary duty' must (i) consist of '[t]he

11

performance of office or nonmanual work directly related to management policies or general

12

business operations of his employer,' and (ii) include the exercise of 'discretion and independent

13

judgment.'"  *In re Farmers Ins. Exchange*, 466 F.3d 853, 859 (9th Cir. 2006) (citing 29 C.F.R. §

14

541.200).  The Sixth Circuit very recently tried to clarify this definition:

15

> "To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  *Id.*  This is often referred to as the administrative-production dichotomy, under which production employees (whose job it is to generate the product or service the business offers to the public) will not qualify for the exemption.

16

17

18

19

20

*Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 644 (6th Cir. 2013) (quoting *Schaefer v. Ind.*

21

*Mich. Power Co.*, 358 F.3d 394, 402 (6th Cir. 2004)).

22

During her time with GMG, Mrs. Hodges was not in a position involving the general business

23

operations of her employer.  She was doing the work necessary to get the product out the door.  She

24

was coordinating the advertising that GMG sold and which generated revenue to GMG.

25

26

[19] "Advertising" is included in the above list, as it is applied to employees whose job it is to advertise the employer's business.  Mrs. Hodges's did not do any work to advertise GMG or its publications.  To the contrary, advertising was a revenue-generator, not a cost, for GMG.  It is the product that is being sold for purposes of the business making money.

27

28

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 46 of 56

1    Administrative positions are distinguished by being cost centers.  Revenue-generating positions that

2    do the work that makes the company money are never the subject of the administrative exemption.

3    Mrs. Hodges position as Senior Traffic Manager most certainly was not indisputably subject to the

4    administrative exemption as a matter of law.

5          GMG is unable to carry its burden of proof that this exemption also applies as a matter of

6    law.  Again, there is evidence in the record from which it reasonably may be concluded that Mrs.

7    Hodges was not exempt from the overtime requirements of the FLSA because of employment in a

8    "in a bona fide administrative capacity."

9    **3.      Mrs. Hodges Was Not Employed in a Professional Capacity**

10         Finally, Mrs. Hodges was not employed by GMG in a bona fide **professional** capacity.

11   According to 29 C.F.R. § 541.300(a):

12              The term "employee employed in a bona fide professional capacity"
                in [29 U.S.C. § 213(a)(1)] shall mean any employee:
13              (1) Compensated on a salary or fee basis at a rate of not less than $
                455 per week (or $380 per week, if employed in American Samoa by
14              employers other than the Federal Government), exclusive of board,
                lodging, or other facilities; and
15              (2) Whose primary duty is the performance of work:
                (i) **Requiring knowledge of an advanced type in a field of science**
16              **or learning customarily acquired by a prolonged course of**
                **specialized intellectual instruction**; or
17              (ii) Requiring invention, imagination, originality or talent in a
                recognized field of **artistic** or **creative** endeavor.
18

19   (Emphasis added).  It is undisputable that Mrs. Hodges work was not "professional" as described at

20   29 C.F.R. § 541.300(a).   There is no evidence that she was performing work that required

21   "knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged

22   course of specialized intellectual instruction."  Her job required knowledge gleaned from years of

23   experience, not in a classroom.  This exemption is clearly inapplicable.

24         GMG is unable to carry its burden of proof that this exemption also applies as a matter of

25   law.  Again, there is evidence in the record from which it reasonably may be concluded that Mrs.

26   Hodges was not exempt from the overtime requirements of the FLSA because of employment in a

27   "in a bona fide professional capacity."

28

THE  LAW  OFFICES  OF
ROBERT P. SPRETNAK
A  PROFESSIONAL  CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123                                                Page 47 of 56

## H.

### Tenth Claim For Relief:

### Defendant Is Liable to Mrs. Hodges for Intentional Infliction of Emotional Distress

Mrs. Hodges has proffered sufficient evidence to be allowed to proceed on her claim that GMG, acting through its agents and employees, is liable to her for intentional infliction of emotional distress.

Under Nevada law, "[t]he elements of a cause of action for intentional infliction of emotional distress are '(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation.'" *Star v. Rabello*, 97 Nev. 124, 125, 625 P.2d 90, 92 (1981)).

A factfinder, reviewing the totality of the evidence, reasonably may conclude that GMG's actions were extreme and outrageous. A reasonable factfinder could conclude that these actions were undertaken either with the intention of causing emotional distress to Mrs. Hodges. A reasonable factfinder would definitely find that Mrs. Hodges did indeed suffer emotional distress. And a reasonable factfinder could well conclude from the available evidence a link between GMG's actions and the emotional distress suffered by Mrs. Hodges. She should be allowed to proceed on this claim.

## J.

### Eleventh Claim For Relief:

### Defendant Wrongfully Interfered with Mrs. Hodges's
### Prospective Employment Opportunities

By terminating Mrs. Hodges under false pretenses, and by notified Mrs. Hodges of this erroneous basis for the termination decision, GMG has wrongfully interfered with prospective employment opportunities that otherwise would have been available to Mrs. Hodges. Ms. Hodges has offered significant evidence that her employment prospects have been significantly impacted as a result of the fact that she was terminated by GMG. A factfinder could well conclude from the available evidence that GMG's actions wrongfully caused this deleterious effect upon Mrs. Hodges's subsequent job prospects.

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 48 of 56

The Nevada Supreme Court has labeled claims of "wrongful interference with contract" a "species" of the broader tort claim of tortious interference with prospective economic advantage. *Leavitt v. Leisure Sports, Inc.*, 103 Nev. 81, 89, 731 P.2d 1221, 1226 (1987). In Leavitt, the Nevada court enunciated the following elements for the broader tort, stating that "this particular tort possesses the following elements: (1) a prospective contractual relationship between the plaintiff and a third party; (2) the defendant's knowledge of this prospective relationship; (3) the intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and, (5) actual harm to the plaintiff as a result of the defendant's conduct." *Id.*, 103 Nev. at 88, 731 P.2d at 1225. For the tort of wrongful interference with an existing contract, only the first two elements need to be adjusted to reflect that there is an existing contractual relationship between the plaintiff and third party. Otherwise, the elements are unchanged.[20]

GMG would have known that Mrs. Hodges would be looking for a new job following her termination as Senior Traffic Manager. By providing a false reason for her termination, in order to cover the decision to fire Mrs. Hodges for her numerous requests for reasonable accommodations under the ADA and for complaining about the racially-insensitive "Nappy Joe" Potluck, GMG's actions harmed Mrs. Hodges's future employment prospects. Mrs. Hodges has actual evidence that her prior employment with GMG prevented her from obtaining particular jobs after her firing from GMG. And there is no justification or privilege protecting the dissemination of a false reason for

---

[20] This was the holding by the California Supreme Court in *Buckaloo v. Johnson*, 527 P.2d 865 (Cal. 1975), which was the case upon which the Nevada Supreme Court based its decision in *Leavitt*. The *Buckaloo* court noted:

As said in the case of *Builders Corporation of America v. United States* (N.D. Cal. 1957) 148 F. Supp. 482, 484, n.1: "Both the tort of interference with contract relations and the tort of interference with prospective contract or business relations involve basically the same conduct on the part of the tortfeasor. In one case the interference takes place when a contract is already in existence, in the other, when a contract would, with certainty, have been consummated but for the conduct of the tortfeasor[.] Rather than characterizing the two as separate torts, the more rational approach seems to be that the basic tort of interference with economic relations can be established by showing, *inter alia*, an interference with an existing contract or a contract which is certain to be consummated, with broader grounds for justification of the interference where the latter situation is presented."

527 P.2d at 869 n.6.

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

1   termination.

2   Thus, from the evidence available, it may well be concluded that GMG wrongfully interfered

3   with Mrs. Hodges's future employment prospects.  For this reason, GMG is not entitled to judgment

4   as a matter of law absolving it of liability for the tort of wrongful interference with prospective

5   economic advantage.

6   **K.**

7   **Twelfth Claim For Relief:**

8   **Defendant Is Liable for Defamation for Causing the Self-Publication**
    **of a False and Defamatory Explanation**
9   **for the Termination of Mrs. Hodges's Employment**

10  Finally, Mrs. Hodges should be allowed to proceed to trial on her eleventh and final claim

11  pled in her Complaint, in which she is seeking damages for the compelled self-publication of

12  defamatory information regarding the facts and circumstances of the termination of her employment

13  from GMG.

14  According to the Nevada Supreme Court, in order to prove defamation, there must be "(1)

15  a false and defamatory statement by defendant concerning the plaintiff; (2) an unprivileged

16  publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed

17  damages." *Chowdhry v. NLVH, Inc.*, 109 Nev. 478, 483, 851 P.2d 459, 462 (1993).  "A statement

18  is, however, defamatory if it 'would tend to lower the subject in the estimation of the community,

19  excite derogatory opinions about the subject, and hold the subject up to contempt.'" *Pegasus v. Reno*

20  *Newspapers, Inc.*, 118 Nev. 706, 715, 57 P.3d 82, 88 (2002) (quoting *K-Mart Corp. v. Washington*,

21  109 Nev. 1180, 1191, 866 P.2d 274, 281-82 (1993)).  "If the defamation tends to injure the plaintiff

22  in his or her business or profession," as would be the case here, "it is deemed defamation per se, and

23  damages will be presumed.  *Chowdhry*, 109 Nev. at 483-85, 851 P.2d at 462.

24  A plaintiff claiming defamation must show that the communication was not privileged.  "A

25  qualified or conditional privilege exists where a defamatory statement is made in good faith on any

26  subject matter in which the person communicating has an interest, or in reference to which he has

27  a right or a duty, if it is made to a person with a corresponding interest or duty." *Circus Circus*

28  *Hotels, Inc.  v. Witherspoon*, 99 Nev. 56, 62, 657 P.2d 101, 105 (1983); *see also Chudacoff v. Univ.*

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 50 of 56

1 | *Med. Center.*, 437 Fed. Appx. 609, 611 (9th Cir. 2011).

2 |      Mrs. Hodges has proffered evidence of the first element of this tort. GMG has made the false

3 | and defamatory allegation that Mrs. Hodges was properly fired for pressuring a colleague not to use

4 | FMLA. GMG has accused Mrs. Hodges of committing a violation of federal law in the name of her

5 | former employer by attempting to interfere with Estee Wright's rights under the FMLA. This

6 | allegation is false. As it paints Mrs. Hodges as a willful violator of federal employment laws, it is

7 | defamatory. This dissemination can have – and has had – a deleterious effect upon Mrs. Hodges's

8 | employment prospects.

9 |      Mrs. Hodges also has proffered evidence of the third element of this tort, as GMG knew or

10 | should have known these allegations were false and damaging. There is evidence in the record from

11 | which a jury could conclude GMG's stated reason for firing Mrs. Hodges was a pretext for unlawful

12 | discrimination or retaliation based on race or disability. Finally, as this is defamation per se, as it

13 | would harm Mrs. Hodges in her chosen profession, damages are presumed as a matter of law.

14 |      The issue is only whether Mrs. Hodges has offered evidence to support a finding that she has

15 | satisfied the second element: publication of the defamatory statement(s) to a third party. Under the

16 | modern trend in defamation law, which has not been adopted nor expressly rejected by the courts

17 | of the State of Nevada, Mrs. Hodges would be able to satisfy this third element based on the doctrine

18 | of compelled self-publication. According to one federal court in California:

19 |         "Publication" by the defendant to a third party ordinarily is an
20 | essential element of a claim for slander. Plaintiff does not allege that defendant published any slanderous statement to anyone other than plaintiff himself. Rather, plaintiff attempts to fit the instant case
21 | within a narrow exception, known as "compelled self-publication": "Self-publication of an alleged defamatory statement may be imputed
22 | to the originator of the statement if '[1] the person demeaned is operating under a strong compulsion to republish the defamatory
23 | statement and [2] the circumstances which create the strong compulsion are known to the originator of the defamatory statement
24 | at the time he communicates it to the person defamed.'"

25 | *Via Alstad v. Office Depot*, 10 I.E.R. Cas. (BNA) 689, at *21-*22 (N.D. Cal. 1995) (quoting *Davis*

26 | *v. Consolidated Freightways*, 34 Cal. Rptr. 2d 438, 448 (Cal. Ct. App. 1994) (citations omitted).

27 |      Mrs. Hodges has proffered evidence sufficient to establish "compelled self-publication" in

28 | accordance with the developing trend of defamation law. When looking for a job, a person must

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 51 of 56

1   explain why they are no longer employed by the previous employer.  There is a compulsion to

2   answer that question or else there is no prospect of obtaining another job.  When a person is

3   terminated for a wholly fictitious reason, the job seeker is left with the terrible choice of telling the

4   "truth" and stating the employer's false and defamatory reason for the termination, which could kill

5   an applicant's employment prospects, or the job seeker could lie, which creates a whole host of other

6   problems.  Thus, Mrs. Hodges has been compelled to self-publish defamatory allegations made about

7   her by her former employer, even if GMG itself is not directly communicating these false allegations

8   to prospective employers.

9       This Court should recognize the modern and developing trend in defamation and find that

10   Mrs. Hodges may satisfy the second element of a defamation claim via compelled self-publication.

11   As she has evidence to support all of the other elements, this claim should be allowed to proceed.

12

13                                              **L.**

14   **Defendant Is Not Entitled to a Court Order Limiting Damages**
     **Based on Particular "After Acquired" Evidence**

15       GMG also is asking this Court to enter an order limiting Mrs. Hodges's potential damages

16   in this case based on its affirmative defense of "after-acquired evidence."  According to the Supreme

17   Court, evidence of wrongdoing that is discovered during the course of litigation can be used as a

18   basis for cutting off damages at the point the alleged wrongdoing is discovered.  *McKennon v.*

19   *Nashville Banner Publishing Co.*, 513 U.S. 352, 360-62, 115 S. Ct. 879, 885-86, 130 L. Ed. 2d

20   (1995).  According to the Court:

21           Once an employer learns about employee wrongdoing that would lead
             to a legitimate discharge, we cannot require the employer to ignore
22           the information, even if it is acquired during the course of discovery
             in a suit against the employer and even if the information might have
23           gone undiscovered absent the suit.  The beginning point in the trial
             court's formulation of a remedy should be calculation of backpay
24           from the date of the unlawful discharge to the date the new
             information was discovered. In determining the appropriate order for
25           relief, the court can consider taking into further account extraordinary
             equitable circumstances that affect the legitimate interests of either
26           party.  An absolute rule barring any recovery of backpay, however,
             would undermine the ADEA's objective of forcing employers to
27           consider and examine their motivations, and of penalizing them for
             employment decisions that spring from age discrimination.

28

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 52 of 56

*Id.*, 513 U.S. at 362, 115 S. Ct. at 886.  Thus, Defendant is correct that it may use evidence revealed in the course of discovery in this case to be used to cut-off back pay damages and to prevent an equitable award of front pay.

However, the "after acquired evidence" doctrine is an affirmative defense and, as such, the employer bears the burden of proving that it would have terminated the plaintiff upon learning of the purported wrongdoing.  "Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge."  *Id.*

In order for GMG to be entitled to an order cutting off damages as of a certain date **as a matter of law**, GMG must be prove definitively and absolutely that it would have taken this action regardless of who the alleged wrongdoer was.  GMG cannot do this.  Nor can GMG definitively establish an exact point when damages should be cut off.

GMG certainly has offered no evidence of a "zero tolerance policy" with regard to its accusation that Mrs. Hodges was supplying surplus prescription drugs to her colleagues.  There is no such policy.  And the proof is that no action has ever been taken against any of the alleged recipients of Mrs. Hodges's surplus prescription medication. Estee Wright – to whom Mrs. Hodges allegedly gave a morphine pill – an allegation that Mrs. Hodges strenuously denies – was given a promotion and not discipline.[21]   While GMG may well argue in reply that the "supplier" is committing a greater offense than the "demander," GMG should at least be able to show that some sort of action was taken after the fact against Ms. Wright and the others identified in emails as wanting "Calgon" to "take" them "away."  No reprimands.  No warnings.  No suspensions.  There is only an argument that African-American Mrs. Hodges, with her catalog of accommodate-able medical issues, would have been fired without warning for a first offense, while Caucasian and otherwise able-bodied colleagues got off scot-free.

Perhaps a jury would see the facts that way.  But it is wholly inappropriate for such a

---

[21]  Ms. Wright's alleged receipt of a morphine pill was discussed in her deposition.  (Ex. 15 at 22:13-23:15)

THE  LAW  OFFICES  OF
ROBERT P. SPRETNAK
A  PROFESSIONAL  CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

1   determination to be made as a matter of law.

2          It is so clear that this is inappropriate for determination on summary judgment that it appears

3   that this was an effort to poison the waters through the use of inadmissible character evidence.[22]  The

4   Federal Rules of Evidence is clear that character evidence may not be used in this manner.

5   According to Fed. R. Evid. 404(a)(1):  "Evidence of a person's character or character trait is not

6   admissible to prove that on a particular occasion the person acted in accordance with the character

7   or trait."  In addition, pursuant to Fed. R. Evid. 404(b)(1):  "Evidence of a crime, wrong, or other act

8   is not admissible to prove a person's character in order to show that on a particular occasion the

9   person acted in accordance with the character."

10          GMG is asking this Court to take notice that it has evidence that Mrs. Hodges was acting

11   recklessly with her prescription medication.  This allegation cannot be used to argue that Mrs.

12   Hodges was a bad person who is not entitled to judgment on her claims of unlawful discrimination

13   and retaliation.  And these inflammatory allegations certainly have nothing to do with Mrs. Hodges's

14   claims for overtime compensation under the FLSA.[23]

15          Therefore, GMG is not entitled to an order of partial summary judgment limiting Mrs.

16   Hodges damages only through the time that GMG discovered its cache of after-acquired evidence.

17                                          **IV.**

18                                    **CONCLUSION**

19          For these reasons, Plaintiff Donna Hodges asks this Court to deny the motion for summary

20   judgment filed by Defendant GMG.  Mrs. Hodges asks this Court to be allowed to proceed to trial

21   _____

22   [22]  Defendant GMG "gives away the game" that it raising this allegation simply to have this
    Court infer that Mrs. Hodges is a bad person by making an issue of the fact that Mrs. Hodges
23   answered questions regarding the disposal of surplus prescription medication by invoking her rights
    under the Fifth Amendment to the United States Constitution.  (Motion at 8:23)  This Court is well
24   acquainted with the fact that an invocation of rights under the Fifth Amendment does not create a
    legal inference of wrongdoing.
25

26   [23]  These allegations are so inflammatory, are so clearly unrelated to the 11 claims pled in the
    Complaint, that these allegations should be stricken pursuant to Fed. R. Evid. 403, as the danger of
27   unfair prejudice outweighs whatever probative value these allegations may have.  This is especially
    true at the summary judgment stage when no one else involved in the purported transfer of surplus
28   prescription medications was ever subject to discipline.

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

on her claims of unlawful discrimination and retaliation on the account of disabilities and race, her claim of unlawful interference with her FMLA rights, her claim for overtime compensation under the FLSA, and her tort claims that have arisen following the termination of her employment.

DATED:  August 22, 2013.

Respectfully submitted,

LAW OFFICES OF ROBERT P. SPRETNAK

By: /s/ Robert P. Spretnak

Robert P. Spretnak, Esq.

Attorney for Donna Hodges

8275 S. Eastern Avenue, Suite 200
Las Vegas, Nevada 89123

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 55 of 56

1

## **CERTIFICATE OF SERVICE**

2          I certify that on August 22, 2013, that a true and correct copy of the above and foregoing

3  **Plaintiff's Response to Document 39: Opposition to Motion for Summary Judgment** was

4  electronically filed and served upon the parties listed below through the Court's Case Management

5  and Electronic Case Filing (CM/ECF) system, pursuant to Fed. R. Civ. P. 5(b)(3) and LR 5-4:

6

7  LITTLER MENDELSON, P.C.
   Rick D. Roskelley, Esq.
   Jamie Chu, Esq.
8  3960 Howard Hughes Parkway, Suite 300
   Las Vegas, Nevada 89169

9

10                                              /s/ Robert P. Spretnak
                                                On behalf of the Law Offices of Robert P. Spretnak
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE LAW OFFICES OF
ROBERT P. SPRETNAK
A PROFESSIONAL CORPORATION
8275 S. EASTERN AVENUE
SUITE 200
LAS VEGAS, NEVADA 89123

Page 56 of 56