**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| DONNA HODGES, | 2:12-CV-1337 JCM (PAL) |
| Plaintiff(s), | |
| v. | |
| GREENSPUN MEDIA GROUP, LLC, | |
| Defendant(s). | |

**ORDER**

Presently before the court is defendant Greenspun Media Group, LLC's motion for summary judgment. (Doc. # 39). Plaintiff Donna Hodges filed a response in opposition (doc. # 45), and defendant filed a reply (doc. # 48).

The instant case involves claims of Title VII discrimination, Title VII retaliation, discrimination under the Civil Rights Act of 1866, discrimination under the Americans with Disabilities Act ("ADA"), discrimination under Nevada state law, violations of the Family Medical Leave Act ("FMLA"), violations of the Fair Labor Standards Act ("FLSA"), intentional infliction of emotional distress, wrongful interference with a prospective economic advantage, and defamation by plaintiff Donna Hodges against her former employer, defendant Greenspun Media Group, LLC. For the purposes of clarity, the court will address plaintiff's statutory claims relating to her termination, then her state tort claims, followed by her claim under the FLSA.

. . .

. . .

James C. Mahan
U.S. District Judge

1    **I.      Legal Standard**

2         The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings,

3    depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

4    show that "there is no genuine issue as to any material fact and that the movant is entitled to a

5    judgment as a matter of law." Fed. R. Civ. P. 56(a). A principal purpose of summary judgment is "to

6    isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24

7    (1986).

8         In determining summary judgment, a court applies a burden-shifting analysis. "When the

9    party moving for summary judgment would bear the burden of proof at trial, it must come forward

10   with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.

11   In such a case, the moving party has the initial burden of establishing the absence of a genuine issue

12   of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213

13   F.3d 474, 480 (9th Cir. 2000) (citations omitted).

14        In contrast, when the nonmoving party bears the burden of proving the claim or defense, the

15   moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential

16   element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to

17   make a showing sufficient to establish an element essential to that party's case on which that party

18   will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24. If the moving party fails

19   to meet its initial burden, summary judgment must be denied and the court need not consider the

20   nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

21        If the moving party satisfies its initial burden, the burden then shifts to the opposing party

22   to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith*

23   *Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing

24   party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the

25   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions

26   of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th

27   Cir. 1987).

28

**James C. Mahan**
**U.S. District Judge**

1   In other words, the nonmoving party cannot avoid summary judgment by relying solely on

2   conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045

3   (9th Cir. 1989). Instead, the opposition must go beyond the assertions and allegations of the

4   pleadings and set forth specific facts by producing competent evidence that shows a genuine issue

5   for trial. *See Celotex Corp.*, 477 U.S. at 324.

6       At summary judgment, a court's function is not to weigh the evidence and determine the

7   truth, but to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*,

8   477 U.S. 242, 249 (1986). The evidence of the nonmovant is "to be believed, and all justifiable

9   inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is

10  merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at

11  249–50.

12  **II.    Claims Regarding Plaintiff's Termination**

13          *A.      Background*

14      Plaintiff began her employment with defendant in June 1999 as an administrative assistant.

15  On February 2, 2008, plaintiff was promoted to the position of traffic manager. On March 16, 2009,

16  plaintiff became a senior traffic manager. Plaintiff continued in this position until her termination

17  on February 1, 2011.

18      During her employment, plaintiff provided medical documentation indicating that she

19  suffered from lumbar radiculopathy, and therefore was unable to lift more than twenty-five pounds

20  and could not bend or stoop for extended periods of time. Though she has not provided documentary

21  evidence, plaintiff claims that she also suffers from severe asthma and sarcoidosis.

22      While she was employed by defendant, plaintiff frequently requested accommodations for

23  her alleged disabilities. These accommodations included a particular ergonomic chair to support her

24  back, a large computer monitor, an electric stapler, and a flexible work schedule. Plaintiff does not

25  dispute that she received all of these accommodations. Defendant provided most of these

26  accommodations without requesting specific evidence demonstrating a medical necessity.

27  . . .

28

**James C. Mahan**
**U.S. District Judge**

- 3 -

1    On July 29, 2010, plaintiff submitted a health care certification and request for intermittent

2    FMLA leave. This request was approved by defendant, and plaintiff was given intermittent leave

3    from July 27, 2010, through her termination on February 1, 2011. Defendant also approved a request

4    by plaintiff to take continuous FMLA leave from August 20, 2010, through August 25, 2010.

5    Plaintiff alleges that defendant did not invite her to weekly sales meetings that were attended

6    by other managers. She claims that she complained to her manager in 2010 about her exclusion from

7    the meetings. Her manager allegedly responded that Joe Vann, defendant's vice president of sales,

8    "would appreciate it if [plaintiff] didn't attend the meetings."

9    In November 2010, an incident occurred in which plaintiff claims she raised complaints

10   regarding a racially offensive poster advertising a "farewell potluck" for a fellow employee. Plaintiff

11   recounted that this poster contained a picture of a can of sloppy joe meat with an "afro" hairdo and

12   the caption "Nappy Joe." A copy of the poster has since been produced by defendant, and merely

13   displays a life-size can with a picture of a sloppy joe sandwich beside a smiling Caucasian woman

14   in a witch costume. The caption on the can reads: "Nappy Shannons – Jan. 26 Noon – Farewell

15   Potluck." The can is topped with an ordinary silver lid, and does not appear to have any hair.

16   According to defendant, on January 25, 2011, one of plaintiff's subordinates, Estee Wright,

17   approached Maria Blondeaux, plaintiff's supervisor, and inquired about defendant's FMLA leave

18   policies. Ms. Wright allegedly stated that plaintiff had advised her not to take FMLA leave, and to

19   take "personal time off" instead. Plaintiff allegedly told Wright that an attempt to use FMLA leave

20   would be held against her and would prevent her from receiving a future promotion within the

21   company. Defendant claims that plaintiff falsely stated that plaintiff had been told by the human

22   resources department that Wright's condition did not qualify for FMLA leave.

23   After hearing these allegations from Ms. Wright, defendant initiated an investigation into

24   plaintiff's conduct. During this investigation, plaintiff denied, as she does now, that she told Ms.

25   Wright not to file for FMLA, and admitted only to telling Ms. Wright that FMLA was reserved for

26   "serious" conditions. After separate interviews with plaintiff and Ms. Wright, defendant concluded

27   that plaintiff's account of the events was not credible, and that plaintiff had disregarded company

28

**James C. Mahan**
**U.S. District Judge**

policies and her managerial training in her interactions with Ms. Wright.

Subsequently, defendant's human resources director and chief operating officer as well as the senior vice president of human resources for the Greenspun Corporation collectively made a decision to terminate plaintiff's employment. Plaintiff was then told that she was being terminated for violating company policy by telling a subordinate that the company would retaliate against her for attempting to utilize FMLA leave.

On February 25, 2011, plaintiff filed a complaint against defendant with the U.S. Department of Labor alleging FMLA interference. Based upon its investigation, the Department of Labor found that plaintiff's allegations were not substantiated, as her employment was terminated for misconduct.

On September 16, 2011, plaintiff filed a charge of discrimination against defendant with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination and retaliation based on race and disability. Upon plaintiff's request, and without completing its investigation, the EEOC issued a dismissal and notice of right to sue on April 30, 2012.

Plaintiff now alleges that defendant violated: (1) Title VII and the Civil Rights Act of 1866 by terminating her on the basis of race, (2) Title VII by retaliating against her for her complaints about the potluck poster, (3) Nevada state law by discriminating against her on the basis of race and disability, (4) the ADA by terminating her due to her disabilities and retaliating against her for protected conduct, and (5) the FMLA by terminating her due to her requests to take medical leave.

    *B.*   *Analysis*

    *1.*   *Title VII Discrimination*

Though plaintiff makes separate claims for discrimination in violation of Title VII and the Civil Rights Act of 1866, the Ninth Circuit has held that the same evidentiary standards and analytical framework apply to both statutes. *See Metoyer v. Chassman*, 504 F.3d 919, 930-31 (9th Cir. 2007). Therefore the court will analyze these claims together.

    <u>I.</u>   <u>Prima Facie Case</u>

Title VII claims are to be analyzed through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "Under this analysis, plaintiffs must first establish

**James C. Mahan**
**U.S. District Judge**

a prima facie case of employment discrimination." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010). "Establishing a prima facie Title VII case in response to a motion for summary judgment requires only minimal proof and does not even need to rise to the level of a preponderance of the evidence." *Palmer v. Pioneer Assocs, Ltd.*, 338 F.3d 981, 984 (9th Cir. 2003) (internal citations and quotations omitted).

To establish a prima facie case, plaintiff must present evidence showing: (1) she is a member of a protected class; (2) she was performing her job in a satisfactory manner; (3) she suffered an adverse employment action; and (4) that similarly situated individuals outside her protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. *See, e.g.*, *Zeinali v. Raytheon Co.*, 636 F.3d 544, 552 (9th Cir. 2011).

Plaintiff alleges and defendant does not dispute that plaintiff is African American, a class protected under Title VII.

Defendant does not allege that plaintiff's performance of her job duties was unsatisfactory, except for the specific incident that allegedly led to her termination.

Plaintiff and defendant agree that plaintiff was terminated from her employment, which is certainly an adverse employment action.

Plaintiff has established that after she was terminated from her position, most of her duties were taken over by a Caucasian employee.

Therefore plaintiff has sufficiently established a prima facie case of Title VII discrimination.

### ii.   Legitimate, Nondiscriminatory Reasons

"If plaintiffs establish a prima facie case, the burden of production, not of persuasion, shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." *Hawn*, 615 F.3d at 1155 (internal citations and quotations omitted). "If defendant meets this burden, plaintiffs must then raise a triable issue of material fact as to whether the defendant's proffered reasons for their terminations are mere pretext for unlawful discrimination." *Id.*

. . .

James C. Mahan
U.S. District Judge

- 6 -

1    Here, defendant has provided significant evidence demonstrating that it terminated plaintiff's

2    employment because plaintiff told Ms. Wright that she would be retaliated against for attempting to

3    take FMLA leave. Defendant's evidence shows that it carried out a thorough investigation in which

4    it questioned plaintiff and Ms. Wright on multiple occasions and came to the conclusion that Ms.

5    Wright's complaints against plaintiff were credible.

6    Defendant also provides evidence that her actions of discouraging Ms. Wright from taking

7    FMLA leave were in direct contravention of her management training, which emphasized that all

8    FMLA requests and inquiries were to be directed to the human resources department. Considering

9    that plaintiff herself acknowledges the importance of FMLA leave and the liability that can ensue

10   over FMLA disputes, the court finds that defendant has carried its burden to produce evidence

11   demonstrating that its reason for terminating plaintiff was legitimate and nondiscriminatory.

12                                    iii.    Pretext

13   "A plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's

14   proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not

15   believable, or (2) directly, by showing that unlawful discrimination more likely motivated the

16   employer." *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1171 (9th Cir. 2007) (internal citations, quotations,

17   and alterations omitted). "All the evidence as to pretext–whether direct or indirect–is to be

18   considered cumulatively." *Id.*

19   Plaintiff's arguments regarding pretext revolve around the "Nappy Shannons" potluck flyer

20   that was posted in the office. The severe discrepancy between plaintiff's description of the poster (a

21   can with an afro hairstyle and the caption "Nappy Joe") and the reality (a can with a Caucasian

22   woman named Shannon standing beside it that says "Nappy Shannons") renders plaintiff's claims

23   of racism devoid of credibility. Furthermore, even if this poster included an image as racially

24   insensitive as the one described by plaintiff, there is no evidence indicating that plaintiff's

25   termination was connected to her reaction to the poster.

26   For these reasons, plaintiff fails to provide any evidence that defendant's proffered reasons

27   for her termination were merely pretextual, or that plaintiff took any adverse action against her on

28

**James C. Mahan**
**U.S. District Judge**

- 7 -

1  the basis of race.

2       Accordingly, the court will grant defendant's motion for summary judgment as it relates to

3  plaintiff's claims of Title VII discrimination and violations of the Civil Rights Act of 1964.

4              *2.    Title VII Retaliation*

5       Federal law holds that "it is unlawful to retaliate against an employee because she has taken

6  action to enforce rights protected under Title VII." *Miller v. Fairchild*, 797 F.2d 727, 730 (9th Cir.

7  1986). "To succeed in a retaliation claim, the plaintiff must demonstrate (1) that she was engaging

8  in protected activity, (2) that she suffered an adverse employment decision, and (3) that there was

9  a causal link between her activity and the employment decision." *Hashimoto v. Dalton*, 118 F.3d

10  671, 679 (9th Cir. 1997).

11      In this claim, plaintiff argues that defendant retaliated against her for making complaints

12  about the "Nappy Shannons" poster. In addition to the dramatic inaccuracy of plaintiff's recollection

13  of the poster's contents, plaintiff fails to provide evidence that there was any causal link between her

14  complaints about the poster and her subsequent termination. Accordingly, the court will grant

15  defendant's motion for summary judgment as to this claim.

16              *3.    Discrimination and Retaliation Under Nevada State Law*

17      Plaintiff claims that she suffered discrimination and retaliation in violation of Nev. Rev. Stat.

18  §§ 613.330 and 613.340. However Nev. Rev. Stat. § 613.430 provides that no action may be brought

19  under these provisions more than 180 days after the date of the act complained of. *See also* Nev.

20  Rev. Stat. § 613.420; *Pope v. Motel 6*, 114 P.3d 277 (Nev. 2005).

21      In this case, plaintiff failed to file her complaint within 180 days of the alleged violations.

22  Plaintiff's own documents allege that the discrimination last occurred on the date of her termination,

23  February 1, 2011. Accordingly, plaintiff had until July 31, 2011 to file her claim. Plaintiff did not

24  file her claim until September 16, 2011–a full 227 days after her termination. Accordingly, because

25  plaintiff fails to provide evidence showing her claims were timely filed, the court will grant

26  defendant's motion for summary judgment as it relates to these claims. *See Russo v. Clearwire US,*

27  *LLC*, 2013 WL 1855753 *4 (D. Nev. 2013).

28

**James C. Mahan**
**U.S. District Judge**

- 8 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**James C. Mahan**
**U.S. District Judge**

4.      *ADA Discrimination*

The ADA prohibits covered employers from discriminating against their employees on the basis of disability. 42 U.S.C. § 12112(a). Discrimination can also occur when an employer fails to make reasonable accommodations for an employee's disability. *See McGary v. City of Portland*, 386 F.3d 1259, 1265-66 (9th Cir. 2004). As with Title VII cases, the courts applies the burden-shifting framework set forth in *McDonnell Douglas* to ADA discrimination claims.

To establish a prima facie case for failure to accommodate and employment termination under the ADA, plaintiff must establish: (1) that she is a disabled person within the meaning of the ADA; (2) that she is qualified to perform the essential functions of her job with reasonable accommodation; and (3) that she suffered an adverse employment action because of her disability. *Allen v. Pacific Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003); *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996).

Though plaintiff claims that she suffers from lumbar radiculopathy, sarcoidosis, and severe asthma, she provides evidence showing that she suffers only from the first condition. Indeed, the medical evidence presented by plaintiff indicates that the only restrictions that defendant was advised to impose were "[n]o lifting [more than] twenty-five pounds." and "[n]o repeated stooping or bending of waist for extended periods." (Doc. # 45-7 p. 2).

Courts have repeatedly found that similar limitations do not establish that someone is disabled within the meaning of the ADA. *See Thompson v. Holy Family Hospital*, 121 F.3d 537, 540 (9th Cir. 1997) (holding "a 25–pound restriction does not amount to a substantial limitation on the ability to lift"); *Mahon v. Craven Crowell*, 295 F.3d 585, 591 (6th Cir. 2002) (finding physical impairments that moderately limited plaintiff's ability to bend and stoop were not sufficiently severe as to render the plaintiff disabled within the meaning of the ADA).

Additionally, because plaintiff provides no evidence showing that she suffered from severe asthma or sarcoidosis, or explaining how she may have been limited by these conditions, she has not demonstrated that she is a "disabled person" within the meaning of the ADA.

. . .

1    Furthermore, the evidence on the record shows that defendant granted plaintiff's numerous

2    requests for accommodations, usually without requiring any documentation. Indeed, defendant

3    provided plaintiff with a large monitor, an electric stapler, and a flexible work-schedule without

4    requiring evidence of medical necessity.

5    Defendants did request medical certification when plaintiff requested that defendant purchase

6    a particular ergonomic chair. After being provided with the requested documentation, defendant also

7    complied with this request. Indeed, plaintiff cannot point to a single accommodation that defendant

8    failed to provide. Therefore, even if plaintiff could show that she was disabled within the meaning

9    of the ADA, she fails to show that her termination was in any way connected to her disability.

10   Accordingly, the court will grant defendant's motion for summary judgment as to plaintiff's

11   claims under the ADA.

12                *5.*     *FMLA Interference*

13   To prevail on a claim that a former employer violated the FMLA through interference, a

14   plaintiff must present evidence establishing that (1) the employee took protected leave, (2) the

15   employer took an adverse action against the employee, and (3) the adverse action was causally

16   related to the employee's FMLA leave. *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112,

17   1125 (9th Cir. 2001).

18   Here, plaintiff fails to provide any evidence showing that her termination was motivated by

19   her use of FMLA leave. In fact, the evidence on the record demonstrates that defendant consistently

20   approved plaintiff's FMLA requests. Plaintiff even concedes that she "had been able to use FMLA

21   without incident" throughout her employment. (Doc. # 45 p. 37). Because there is no evidence of a

22   causal relationship between plaintiff's use of FMLA leave and her termination, the court will grant

23   defendant's motion for summary judgment as to this claim.

24   **III.   Tort Claims Arising Under Nevada Law**

25   Along with her statutory claims, plaintiff argues that defendant committed (1) intentional

26   infliction of emotional distress, (2) wrongful interference with a prospective economic advantage,

27   and (3) defamation in the actions it took surrounding her termination.

28

**James C. Mahan**
**U.S. District Judge**

1                    *1.*     *Intentional Infliction of Emotional Distress*

2          To establish a claim of intentional infliction of emotional distress, plaintiff must prove: (1)

3 defendant engaged in "extreme and outrageous conduct with either the intention of, or reckless

4 disregard for, causing emotional distress; (2) [plaintiff] suffered severe or extreme emotional

5 distress; and (3) actual or proximate causation." *Posadas* v. *City of Reno,* 851 P.2d 438, 444 (Nev.

6 1993).

7          Plaintiff claims that defendant engaged in extreme and outrageous conduct by expecting her

8 to attend walking tours of clients' facilities, requiring her to attend dinner with a client, maintaining

9 a work environment that exacerbated her infirmities, and by reprimanding her when she did not

10 attend events or complained about the working conditions.

11          Under Nevada law, extreme and outrageous conduct is that "which is outside all possible

12 bounds of decency and is regarded as utterly intolerable in a civilized society." *Welder v. University*

13 *of Southern Nevada*, 833 F. Supp. 2d 1240, 1245 (D. Nev. 2011).

14          Plaintiff simply provides no support for the contention that defendant's conduct was extreme

15 and outrageous. Furthermore, plaintiff's allegations merely describe routine conduct associated with

16 employment in a professional workplace. Nevada law holds "a simple pleading of personnel

17 management activity is insufficient to support a claim of [IIED], even if improper motivation is

18 alleged." *Id.*

19          Accordingly, the court will grant defendant's motion for summary judgment as to this claim.

20                 *2.*     *Wrongful Interference with a Prospective Economic Advantage*

21          To establish a claim of wrongful interference with a prospective economic advantage, a

22 plaintiff must show "(1) a prospective contractual relationship between the plaintiff and a third party;

23 (2) the defendant's knowledge of this prospective relationship; (3) the intent to harm the plaintiff by

24 preventing the relationship; (4) the absence of privilege or justification by the defendant; and, (5)

25 actual harm to the plaintiff as a result of the defendant's conduct."

26          Plaintiff claims that defendant interfered with potential relationships with future employers

27 by providing a false reason for her termination, when it truly dismissed her due to her disabilities and

28

**James C. Mahan**
**U.S. District Judge**

1    race. However, as previously stated, plaintiff has not provided any evidence that defendant's

2    proffered reason for the termination was merely pretext for unlawful discrimination.

3           Furthermore, plaintiff admits that she has no knowledge as to whether defendant has told any

4    potential employers the reason for her termination. Plaintiff also fails to provide evidence that

5    defendant had any knowledge as to where she was seeking employment. For these reasons, plaintiff

6    fails to fulfill her burden to provide evidence supporting each element of this tort. Accordingly the

7    court will grant defendant's motion for summary judgment as it relates to this claim.

8                        *3.      Defamation*

9           A claim for defamation under Nevada law requires "(1) a false and defamatory statement

10   of fact by the defendant concerning the plaintiff; (2) an unprivileged publication to a third person;

11   (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Pope v. Motel 6*,

12   114 P.3d 277, 282 (Nev. 2005).

13          Plaintiff acknowledges that she has no evidence demonstrating that defendant communicated

14   the reason for her termination to any third party.  Plaintiff claims that due to defendant's actions, *she*

15   will be forced to communicate defendant's explanation for her termination to third parties. With this

16   claim, plaintiff requests that the court utilize the "compelled self-publication" doctrine that has never

17   previously been recognized under Nevada law.

18          Under the compelled self-publication doctrine, a defendant need not have actually published

19   a defamatory statement if "(1) the person demeaned is operating under a strong compulsion to

20   republish the defamatory statement and (2) the circumstances which create the strong compulsion

21   are known to the originator of the defamatory statement at the time he communicates it to the person

22   defamed." *Davis v. Consolidated Freightways*, 34 Cal. Rptr. 2d 438, 448 (Cal. Ct. App. 1994).

23          However, even courts that recognize compelled self-publication have held that the doctrine

24   does not apply in the employment termination context. *See Olivieri v. Rodriguez*, 122 F.3d 406, 408

25   (7th Cir. 1997). In such cases, a plaintiff is not necessarily "compelled" to communicate the reason

26   for her termination, because future employers may not ask. Furthermore, holding former employers

27   accountable for a plaintiff's communication of the reason for her termination would create a perverse

28

James C. Mahan
U.S. District Judge

- 12 -

incentive for plaintiffs to maximize potential damages by volunteering the "false" statements of their former employer without being asked.

Because of the uncertainty and precarious incentives created by the application of the compelled self-publication doctrine in the employment termination context, the court finds that, even if this principle were generally recognized under Nevada law, it would not be applicable in this case.

Therefore, plaintiff fails to provide evidence showing that defendant's explanation for her termination was communicated to any third party. Accordingly, the court will grant defendant's motion for summary judgment as it relates to plaintiff's defamation claim.

**IV.   FLSA Claim**

    *A.   Background*

Prior to her termination, plaintiff worked as a "senior traffic manager" for defendant. Plaintiff states that her job duties included managing and evaluating between four and seven traffic coordinators, distributing the workflow of her department, counseling her subordinates about their work performance, approving employee leave requests, participating in interviews for new employees, making hiring recommendations, overseeing the integrity of the system that drove defendant's business and revenue, and training employees in other departments. (Docs. ## 39-1 pp. 41, 45, 52-53; 39-2 pp. 34, 37, 39-40; 39-3 p. 36).

Plaintiff alleges that defendant failed to pay overtime due to its incorrect classification of her as an exempt executive employee. Plaintiff asserts that she was not truly a supervisor and did not have direct authority to hire or fire employees. Therefore, she argues, her position does not fall within the FLSA executive employee exemption.

Additionally plaintiff claims that, she routinely worked more than seventy hours a week in her position as a senior traffic manager. Plaintiff claims she is entitled to overtime pay for all of the time she worked above the forty-hour-per-week threshold.

    *B.   FLSA Framework*

The FLSA was created to provide a uniform national policy of guaranteeing compensation for all work or employment covered by the act. *Barrentine v. Arkansas–Best Freight Sys., Inc.*, 450

1  U.S. 728, 741 (1981). The FLSA provides an exemption from overtime pay for persons "employed

2  in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). An

3  "employer who claims an exemption from the FLSA has the burden of showing that the exemption

4  applies." *Donovan v. Nekton, Inc.,* 703 F.2d 1148, 1151 (9th Cir. 1983).

5       "Because the FLSA is to be liberally construed to apply to the furthest reaches consistent with

6  congressional direction, FLSA exemptions are to be narrowly construed against employers and are

7  to be withheld except as to persons plainly and unmistakenly within their terms and spirit." *Bothell*

8  *v. Phase Metrics, Inc.*, 299 F.3d 1120, 1124-25 (9th Cir. 2002) (internal quotation marks and

9  citations omitted).

10       Whether plaintiff's activities as a senior traffic manager made her exempt from the overtime

11 benefits of the FLSA is a question of law. *Bothell,* 299 F.3d at 1124 (9th Cir. 2002) (citing *Icicle*

12 *Seafoods, Inc. v. Worthington,* 475 U.S. 709, 714 (1986)).

13       In order to qualify for the executive employee exemption under 29 C.F.R. § 541.100,

14 defendant must show that plaintiff was an employee:

15       (1) [That was] compensated on a salary basis at a rate of not less than
         $455 per week . . . exclusive of board, lodging or other facilities;

16
17       (2) Whose primary duty [was] management of the enterprise in which
         the employee [was] employed or of a customarily recognized
         department or subdivision thereof;

18
19       (3) Who customarily and regularly direct[ed] the work of two or more
         other employees; and

20       (4) Who ha[d] the authority to hire or fire other employees or whose
         suggestions and recommendations as to the hiring, firing,
21       advancement, promotion or any other change of status of other
         employees [were] given particular weight.

22

23       Because defendant meets its burden of demonstrating that all of these criteria are met and

24 plaintiff does not raise any genuine issues of material fact, the court finds that plaintiff falls within

25 the executive employee exemption, and is therefore not entitled to overtime under the FLSA.

26 . . .

27 . . .

28

**James C. Mahan**
**U.S. District Judge**

- 14 -

*1. Compensation*

Defendant claims and plaintiff does not dispute that plaintiff earned an annual salary of $50,140. This amount exceeds the $455 per week minimum required for the executive employee exemption.

*2. Primary Duty*

29 C.F.R § 541.102 states:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

In plaintiff's discussion of her primary duties as a senior traffic manager, plaintiff points to certain responsibilities that she *did not* have in her position. She says that she did not determine employee compensation, maintain records regarding the work of fellow employees, have unilateral power over employee evaluations, formally handle employee complaints, determine the supplies to be used, create a budget, or ensure legal compliance. (Doc. # 45 p. 51-52).

However, looking beyond the possibly infinite list of management responsibilities that were not assigned to plaintiff, and observing the responsibilities she did have, it is clear that plaintiff's duties were managerial in nature.

In her deposition, plaintiff admitted that the number one priority in her position was "managing the day-to-day operations of both traffic departments and streamlin[ing] the workflow of both the GMG and Niche Traffic Departments and ensuring a [high level of] accuracy while minimizing mistakes." (Doc. # 39-3 p. 270). Specifically, plaintiff stated that

she was responsible for recommending distributions of assignments to ensure an even workload, counseling employees in her department to improve their work performance, issuing warnings, and directly overseeing employee leave requests. Furthermore, plaintiff participated in interviews of potential employees and was asked for hiring recommendations.

Therefore, plaintiff's account of her job tasks underscores that nearly all of her duties were managerial in nature. Though plaintiff indicates that many of her job responsibilities required collaboration with and approval from her direct supervisor, classification as a manager does not require that an employee has absolute, unfettered discretion in her position. Indeed, plaintiff's account clearly indicates that her tasks consisted of "directing the work of employees," "planning the work," "apportioning the work among the employees," and "controlling the flow and distribution of merchandise," all of which fall within the category of "management" under 29 C.F.R. § 541.102.

Therefore, due to plaintiff's own description of her job activities, the court finds that plaintiff had the primary duty of managing a department while she was employed as a senior traffic manager.

### 3.   Two or More Employees

Defendant alleges and plaintiff does not dispute that plaintiff managed at least four full time employees who reported directly to plaintiff. Therefore the court finds that plaintiff customarily and regularly directed the work of two or more other employees.

### 4.   Authority to Hire and Fire

Lastly, the court must determine whether plaintiff had the authority to hire and fire associates in her department, or at least that her recommendations were given weight by her superiors.

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. . . . An employee's suggestions and recommendations may still

1
2
3

be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

4    29 C.F.R. § 541.105.

5         Plaintiff indicates that she participated in interviews with potential employees and

6    that she was consistently asked for her recommendation. Additionally, the evidence

7    demonstrates that plaintiff had the power to issue warnings and was responsible for

8    evaluating employees, though the evaluations ultimately had to be approved by plaintiff's

9    direct supervisor.

10        Plaintiff argues that this evidence demonstrates that she was misclassified as exempt

11   because she did not have direct authority to hire and fire employees. However, the

12   regulations specifically state that an individual can be an executive employee "even if the

13   employee does not have authority to make the ultimate decision . . . ." *Id.* The fact that

14   plaintiff participated in interviews and was consistently asked for her recommendation

15   indicates that her suggestions were given particular weight. Therefore, the final criterion of

16   the executive exemption is met in this case.

17        Accordingly, because the court finds that plaintiff was compensated on a salary basis

18   at a rate of not less than $455 per week, that her primary duty in the role of senior traffic

19   manager was management of a recognized department of defendant's enterprise, that she

20   customarily and regularly directed the work of two or more other employees, and that her

21   suggestions and recommendations as to the hiring, firing, advancement, or any other change

22   of status of other employees were given particular weight, the court holds that plaintiff was

23   properly classified as an exempt employee pursuant to 29 U.S.C. § 213(a)(1) and 29 C.F.R.

24   § 541.100(a).

25        Because plaintiff fell within the executive employee exemption, defendant had no

26   obligation to grant her additional compensation for work performed in excess of eight hours

27   per day and/or forty hours per week. *See* 29 U.S.C. § 213(a)(1). As such, the court will grant

28

**James C. Mahan**
**U.S. District Judge**

1  defendant's motion for summary judgment as to plaintiff's FLSA claim.

2        Because the court finds that plaintiff fell within the executive employee exemption,

3  it need not address whether plaintiff also fell within the administrative employee exemption

4  pursuant to the FLSA.

5        Accordingly,

6        IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that defendant's motion

7  for summary judgment (doc. # 39) be, and the same hereby is, GRANTED. The clerk shall

8  enter judgment accordingly and close the case.

9        DATED February 28, 2014.

10

11  _____

12  UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

James C. Mahan
U.S. District Judge